_____

No. 96-1170
_____

Michael McCormack,                          *
                                            *
            Appellant,                      *
                                            *  Appeal from the United States
     v.                                     *  District Court for the
                                            *  District of Nebraska.
Citibank, N.A., a corporation;              *
National Bank of Commerce Trust             *
& Savings Association, a                     *
corporation; First Westroads                *
Bank, a corporation,                        *
                                            *
            Appellees.                      *


                          _____

            Submitted:  September 11, 1996

               Filed:  November 5, 1996
                          _____

Before MAGILL, FLOYD R. GIBSON, and LAY, Circuit Judges.

                          _____

MAGILL, Circuit Judge.


     Michael McCormack appeals the district court's[1] order granting
summary judgment to three defendant banks: First Westroads Bank (First
Westroads), National Bank of Commerce Trust and Savings Association (NBC),
and Citibank, N.A. (Citibank).  McCormack, who filed this suit as the
subrogee of Acoustical Engineering, Inc. (Acoustical), alleges breach of
contract and negligence by the defendant banks in connection with a letter
of credit and guarantee transaction.  On appeal, McCormack argues that
genuine issues of material fact remain.  He also argues that the district
court

_____

     [1]The Honorable Lyle E. Strom, United States District Judge
for the District of Nebraska.

committed reversible error by failing to hold oral argument on the defendant banks' summary judgment motion.  We affirm.

**I.**

**A.**

This case involves a complex international transaction between Acoustical and Obaid & Almulla Construction Company (Obaid), a Saudi Arabian corporation.  At the heart of the matter are the questions of whether the defendant banks breached their contract with Acoustical or, in the alternative, breached a duty they owed to Acoustical.

Because this is an appeal from a grant of summary judgment, we must view the facts in the light most favorable to the nonmoving party.  See Rifkin v. McDonell Douglas Corp., 78 F.3d 1277, 1280 (8th Cir. 1996).  Accordingly, viewed in the light most favorable to McCormack, the facts that gave rise to this dispute are summarized below.

In November 1980, Acoustical entered into a contract with Obaid to furnish materials and labor as part of the construction of an airport terminal in Riyadh, Saudi Arabia.  As part of this agreement, Obaid required that Acoustical have a Saudi bank issue a performance guarantee to Obaid in the amount of 5% of the value of Acoustical's construction contract, or approximately $150,000.  The performance guarantee was like an insurance policy for Obaid; in the event that Acoustical failed to perform under the agreement, Obaid could draw on the guarantee.

To arrange for the performance guarantee, Acoustical contacted First Westroads, its local bank in Nebraska.  Because First Westroads was unable to arrange the guarantee directly, First Westroads contacted its correspondent bank, NBC, which in turn

contacted its correspondent bank, Citibank. Citibank ultimately contacted the Saudi American Bank (SAMBA), the Saudi bank that Acoustical and Obaid had chosen to issue the performance guarantee.

SAMBA issued a performance guarantee to Obaid on behalf of Acoustical. In support of this guarantee, Citibank issued a "clean sight credit" to SAMBA, see I Appellant's App. at 22, Ex. A; NBC agreed to reimburse Citibank upon demand; and First Westroads agreed to reimburse NBC upon demand. For its part, Acoustical agreed to cover the amount of the guarantee as well as pay the fees charged by the banks for their services. In this way, the economic burden of a draw by Obaid on the performance guarantee would flow through the banks and would ultimately be borne by Acoustical.

As part of their original understanding, Acoustical and Obaid had also agreed that the performance guarantee would be replaced by a maintenance guarantee upon completion of Acoustical's work. This second guarantee was to serve as a warranty for the work performed by Acoustical. Obaid could draw upon the maintenance guarantee if Acoustical did not perform necessary repairs. The maintenance guarantee was to run for a period of fourteen months from the date of the completion of Acoustical's work and was to be issued by a Saudi bank in the same amount as the performance guarantee. It is this second guarantee that gave rise to the dispute now before us.

In anticipation of the completion of Acoustical's performance on the construction contract,[2] Acoustical and Obaid, with the help of First Westroads and NBC, began to negotiate the exact terms to be included in the maintenance guarantee. Sometime before March 14, 1983, a draft of the maintenance guarantee was completed. Significantly, both Acoustical and Obaid agreed that Obaid could not draw on the maintenance guarantee unless Obaid first presented a "Certificate of Completion of the Works" (Certificate). The

---

[2]Acoustical completed its work in June 1983.

Certificate was also intended to signal the expiration of the prior performance guarantee and the start of the warranty period under the maintenance guarantee.

In a letter dated March 14, 1983, Acoustical again asked its local bank, First Westroads, to arrange for the maintenance guarantee to be issued by SAMBA, the Saudi bank that Acoustical and Obaid had once again chosen. This request initiated a process similar to the one used for the earlier performance guarantee: First Westroads enlisted the aid of its correspondent bank, NBC, which in turn contacted its correspondent bank, Citibank, which in turn contacted SAMBA.

To support the maintenance guarantee, First Westroads agreed to reimburse NBC on demand for any draws that NBC was required to pay to Citibank. NBC in turn agreed to reimburse Citibank on demand for any draws that Citibank was required to pay to SAMBA. NBC also requested in a March 21, 1983 telex that Citibank again issue a "clean sight credit" in favor of SAMBA, as it had previously done for the performance guarantee, so that SAMBA could be reimbursed for any draws made by Obaid on the maintenance guarantee. See I Appellant's App. at 16, Ex. 4. Finally, for its part, Acoustical agreed to cover the amount of the guarantee as well as pay the banks for their services.

Throughout the process of arranging the maintenance guarantee, the version of this guarantee drafted by Acoustical and Obaid was forwarded to each of the defendant banks in the chain and was ultimately passed along to SAMBA. Included in this document was the following language pertaining to the effectiveness of the maintenance guarantee:

> THIS GUARANTEE BECOMES VALID AND SHALL TAKE EFFECT ONLY UPON
> THE ISSUANCE OF A CERTIFICATE OF COMPLETION OF THE WORKS, BY
> OBAID AND ALMULLA CONSTRUCTION COMPANY LTD.

I Appellant's App. at 17, Ex. 2.  This document also called for Citibank to issue the guarantee, even though Acoustical had specifically asked for SAMBA to issue the guarantee in its March 14 letter to First Westroads.

On April 11, 1983, SAMBA telexed Citibank to request certain clarifications and changes.  This request was then relayed to NBC.  On May 13, 1983, NBC in turn relayed SAMBA's request to First Westroads and to Acoustical's president, Gerald E. Carlson, via telex.  This May 13 telex is crucial to understanding the dispute between McCormack and the defendant banks.

In keeping with Acoustical's March 14 letter, the telex requested acknowledgement that SAMBA, not Citibank, was to issue the maintenance guarantee.  The telex also relayed SAMBA's request that certain language be added to the guarantee--two portions of which are relevant here.  The first portion pertained to the Certificate and to SAMBA's request for a "clean credit" to be issued by Citibank:

> SAUDI AMERICAN BANK WILL BE NOTIFIED BY OBAID AND AL MULLAH THAT CERTIFICATE OF COMPLETION HAS BEEN ISSUED AND THAT THE GUARANTEE IS IN FULL FORCE ACKNOWLEDGED BY .M/S ACOUSTICAL ENGINEERING REQUIRED.  PLEASE ISSUE A CLEAN CREDIT IN OUR FAVOR IN THE FOLLOWING FORMAT ENABLING US TO ISSUE THE GUARANTEE.

I Appellant's App. at 16, Ex. 6.  The second portion also pertained to the letter of credit to be issued by Citibank to SAMBA:

> IN CONSIDERATION OF YOUR ISSUING YOUR GUARANTEE IN FAVOR

OF OBAID . . . WE IRREVOCABLY AND UNCONDITIONALLY CONFIRM THAT, UPON RECEIPT OF YOUR FIRST WRITTEN DEMAND, WE WILL PAY YOU THE AMOUNT DEMANDED NOT EXCEEDING THE LIMIT SET FORTH HEREIN, EACH DEMAND BY YOU SHALL BE EITHER IN THE FORM OF A TESTED TELEX OR A LETTER, IN EITHER CASE STATING THAT YOU HAVE BEEN CALLED UPON TO PAY OR HOLD VALUE FOR THE AMOUNT UNDER YOUR ABOVE MENTIONED GUARANTEE . . . .

Id. Finally, the May 13 telex advised Carlson: "PLEASE MAKE SURE YOU UNDERSTAND ALL OF THE POINTS OF THE AMENDMENT", id., and requested that Carlson and First Westroads sign the bottom of the telex in order to "[CONFIRM THEIR] AUTHORIZATION TO AMEND THE CREDIT." Id.

Unsure of what this language meant, Carlson first turned to McCormack, who was Acoustical's lawyer at the time. McCormack advised Carlson to ask NBC for advice. When asked for advice, NBC told Carlson that the amendments were essentially administrative changes. Evidently, Carlson believed that this assurance meant that none of the defendant banks would be obligated to pay unless a Certificate of Completion had been issued by Obaid. Acting on behalf of Acoustical, Carlson approved the terms of the May 13 telex in writing on May 26, 1983. First Westroads approved the changes as well.

After receiving this approval, SAMBA issued the maintenance guarantee and Citibank issued a letter of credit in SAMBA's favor as provided in the May 13 telex. Acoustical later approved in writing a series of amendments that extended the expiration date of both SAMBA's guarantee and Citibank's letter of credit.

In September 1985, SAMBA honored a draw by Obaid on the maintenance guarantee, despite the fact that Obaid had not issued

a Certificate.[3]   After Acoustical was unsuccessful in obtaining an injunction, each of the defendant banks in turn honored their respective obligations to reimburse the next bank in the chain.  First Westroads, as the bank at the end of the chain, then looked to Acoustical for payment. When Acoustical could not meet its obligations, First Westroads foreclosed on security that had earlier been pledged by Acoustical, Carlson, Carlson's wife and McCormack.  Acoustical was later dissolved on April 16, 1987, via a certificate issued by the Nebraska Secretary of State for nonpayment of taxes.

**B.**

The procedural history of this case is almost as complex as the underlying facts.  McCormack, as subrogee of Acoustical, filed the instant action in September 1989 seeking damages from the defendant banks under various theories of breach of contract and negligence.

Upon a motion by the defendant banks, the district court dismissed McCormack's cause of action.  McCormack v. Citibank, No. 89-0-574 (D. Neb. Apr. 30, 1990).  On appeal, this Court in McCormack v. Citibank, 979 F.2d 643 (8th Cir. 1992), reversed the district court.

In December 1992 and again in January 1993, the defendant banks filed several motions to dismiss or, in the alternative, for summary judgment. These motions were denied.  On March 17, 1995, the defendant banks filed yet another motion for summary judgment.  Included in this motion was a request for oral argument.  McCormack filed affidavits and documents in opposition to this motion on

---

[3]McCormack originally named SAMBA as one of the defendants. SAMBA filed a motion to dismiss on jurisdictional grounds and this motion was granted by the district court.  McCormack does not challenge this decision.

April 6, 1995, but did not request oral argument.  The district court then filed a decision granting summary judgment on September 25, 1995, without first holding oral argument.

On October 5, 1995, McCormack brought a motion for relief from judgment under Fed. R. Civ. P. 60(b)(2) or, in the alternative, for a new trial under Fed. R. Civ. P. 59(a) or, in the alternative, to alter or amend a judgment under Fed. R. Civ. P. 59(e).  The district court denied these motions and McCormack now appeals.

## II.

McCormack posits two alternative theories as to why the district court erred in granting summary judgment.  He argues that genuine issues of material fact remain because the terms of the letter of credit issued by Citibank were ambiguous or, in the alternative, because the defendant banks breached a duty they owed to Acoustical.

On appeal, we review the district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party.  Farm Credit Servs. v. Arkansas, 76 F.3d 961, 962 (8th Cir. 1996), pet. for cert. filed, 64 U.S.L.W. 3808 (U.S. May 22, 1996) (No. 95-1918). Summary judgment is appropriate only where the record presents "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Farm Credit Servs., 76 F.3d at 962.  If no rational trier of fact could find for the nonmoving party, then summary judgment is appropriate.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

We have jurisdiction in this action pursuant to 12 U.S.C. § 632 (1994).  As determined by the district court, Nebraska law applies in this action.  See Summ. J. Mem. Op. at 7.

Under Nebraska law, a letter of credit or credit is defined as "an engagement by a bank or other person made at the request of a customer and of a kind . . . that the issuer will honor drafts or other demands for payment upon compliance with the conditions specified in the credit."  Neb. Rev. Stat. U.C.C. § 5-103(1)(a) (1995).  There are two fundamental types of letters of credit: documentary and clean.  To draw on a documentary letter of credit, the beneficiary of that credit must present the issuing bank with whatever documentation that is called for by the express terms of the credit.  John F. Dolan, The Law of Letters of Credit § 2.04, at 2-14 (3d ed. 1996); Burton V. McCullogh, Letters of Credit § 1.01[1] (1996). In contrast, to draw on a clean letter of credit, the beneficiary must merely demand payment; no documentation, other than perhaps a written demand for payment, is required.  McCullogh, supra, § 1.01[1].  A sight credit is a letter of credit that, like a clean letter of credit, calls for the issuer to honor a beneficiary's draft, or demand for payment, upon presentation of that draft.  Dolan, supra, § 1.02[1].

An issuer of a letter of credit "must honor a draft or demand for payment which complies with the terms of the relevant credit . . . ."  Neb. Rev. Stat. U.C.C. § 5-114(1).  Moreover, "[u]nless otherwise agreed an issuer which has duly honored a draft or demand for payment is entitled to immediate reimbursement . . . ."   Neb. Rev. Stat. U.C.C. § 5-114(3).

## A.

McCormack argues that the terms of the letter of credit issued by Citibank were ambiguous, and therefore, a genuine issue of fact remains as to whether Citibank's letter of credit was documentary or clean.  According to McCormack, the defendant banks should not have honored any draws made by Obaid because a Certificate of Completion of the Works was never issued. The defendant banks counter that the letter of credit issued by Citibank was a clean

-9-

letter of credit and that Citibank was consequently obligated to pay SAMBA upon demand regardless of whether a Certificate had been issued. According to the defendant banks, the only party that was obligated to wait for the issuance of a Certificate, prior to releasing any funds, was SAMBA.

We recognize that the meaning of an unambiguous contract presents a question of law appropriate for summary judgment. See Michalski v. Bank of Am. Ariz., 66 F.3d 993, 996 (8th Cir. 1995). "Conversely, the interpretation of an ambiguous contract presents a question of fact, thereby precluding summary judgment." Id.

Under Nebraska law, the determination of whether a contract is ambiguous is a matter of law. Kropp v. Grand Island Pub. Sch. Dist. No. 2, 517 N.W.2d 113, 116 (Neb. 1994). A contract is only ambiguous "when the instrument at issue is susceptible of two or more reasonable but conflicting interpretations or meanings." Boyles v. Hausmann, 517 N.W.2d 610, 615 (Neb. 1994). However, "the fact that the parties have suggested opposing meanings of the disputed instrument does not necessarily compel the conclusion that the instrument is ambiguous." Id. Moreover, "[a] contract written in clear and unambiguous language is not subject to interpretation or construction and must be enforced according to its terms." C.S.B. Co. v. Isham, 541 N.W.2d 392, 396 (Neb. 1996).

Applying these standards to the facts before us, we find that the terms of the letter of credit issued by Citibank were clear and unambiguous. In the May 13 telex, Acoustical's president, Carlson, was specifically notified that SAMBA had requested that Citibank "ISSUE A CLEAN CREDIT IN OUR FAVOR . . . ." I Appellant's App. at 16, Ex. 6. Moreover, Carlson was asked to, and did, approve the language of the letter of credit to be issued by Citibank. This language read as follows: "WE IRREVOCABLY AND UNCONDITIONALLY CONFIRM THAT, UPON RECEIPT OF YOUR FIRST WRITTEN DEMAND, WE WILL PAY YOU THE AMOUNT DEMANDED NOT EXCEEDING THE LIMIT SET FORTH

HEREIN . . . ." Id. The telex further provided that the written demand "SHALL BE EITHER IN THE FORM OF A TESTED TELEX OR A LETTER, IN EITHER CASE STATING THAT YOU HAVE BEEN CALLED UPON TO PAY OR HOLD VALUE FOR THE AMOUNT UNDER YOUR ABOVE MENTIONED GUARANTEE . . . ." Id.

The May 13 telex thus expressly calls for the issuance of a "clean" letter of credit by Citibank. In addition, the language of the proposed letter of credit, by calling for payment merely upon written demand, is entirely consistent with a clean letter of credit and is wholly inconsistent with a documentary letter of credit. Finally, the language nowhere mentions that a Certificate of Completion of the Works or any other special documentation must be presented before Citibank is obligated to pay. Instead, the language obligates Citibank to pay upon receipt of a written demand in the form of a telex or letter.

Carlson expressly approved this language in writing on May 26, 1983, after he was specifically warned: "PLEASE MAKE SURE YOU UNDERSTAND ALL OF THE POINTS OF THE AMENDMENT." Id. As a result of his express written approval, the terms of the May 13 telex are properly considered as part of the letter of credit because all parties involved agreed to them. See Neb. Rev. Stat. U.C.C. §§ 5-104(1), -106(2) (setting forth requirements for modifying letter of credit). McCormack, however, contends that the May 13 telex was an addition to, and not an amendment of, the original draft of the maintenance guarantee. He argues that, when these documents are read together, the May 13 telex is ambiguous.

McCormack correctly points out that the May 13 telex twice directed the parties to "add" additional terms to the Citibank letter of credit. He also correctly notes that the original draft of the maintenance guarantee called for Citibank to issue a guarantee to Obaid and that the guarantee was to "TAKE EFFECT ONLY UPON THE ISSUANCE OF A CERTIFICATE OF COMPLETION OF THE WORKS, BY

-11-

OBAID . . . ." I Appellant's App. at 17, Ex. 2. Because this language imposes a requirement that a Certificate must be presented before Citibank is obligated to pay, McCormack argues that, when the language of the original document is added to the language of the May 13 telex, it is unclear whether the Citibank letter of credit was clean or documentary.

McCormack's efforts to parse the language of the May 13 telex, however, do not offer a reasonable interpretation of that document. The only reasonable interpretation of the May 13 telex is that it amended the original maintenance guarantee. Although the May 13 telex called for terms to be added, it also spoke of "THE AMENDMENT THAT CITIBANK NEW YORK HAS REQUESTED," it requested that the parties "PLEASE AMEND THE ABOVE REFERENCED LETTER OF CREDIT AS FOLLOWS," and it warned Carlson to "UNDERSTAND ALL OF THE POINTS OF THE AMENDMENT." I Appellant's App. at 16, Ex. 6. Thus, the defendant banks clearly indicated an intention to amend, not merely add to, the earlier agreement.

Furthermore, the May 13 telex superseded the original maintenance guarantee. Under Nebraska law, "'[w]here a later contract is entered into between the same parties in relation to the same subject matter as the earlier one, and [the later contract] fully covers the terms of the earlier one, the later contract supersedes the earlier one which is deemed merged in it . . . .'" Hasenauer v. Durbin, 346 N.W.2d 695, 698 (Neb. 1984) (quoting 17A C.J.S. Contracts § 382 (1963)); cf. Havelock Bank of Lincoln v. Bargen, 321 N.W.2d 432, 435 (Neb. 1982) (later mutual assent modified personal guaranty agreement).

Because the later May 13 telex was between the same parties and covered the same subject matter as the original draft of the maintenance guarantee, it superseded the earlier draft of the maintenance guarantee, thereby accomplishing two significant changes. First, the May 13 telex substituted SAMBA for Citibank as

-12-

the issuer of the maintenance guarantee.  Second, it expressly called for a clean letter of credit to be issued by Citibank.

These provisions directly contradict the requirement in the original draft of the maintenance guarantee that would have obligated Citibank to refrain from paying until a Certificate was issued.  The first change, by substituting SAMBA for Citibank, removed any obligation that Citibank would have had as issuer of the maintenance guarantee.  Instead, SAMBA, as issuer of the maintenance guarantee, became obligated to refrain from paying unless a Certificate was issued.  The second change obligated Citibank to pay upon demand.  Thus, because it called for terms wholly inconsistent with the earlier draft of the document, the only reasonable interpretation of the May 13 telex is that it amended the original draft of the maintenance guarantee.  It made SAMBA liable under the terms of the documentary guarantee and called for Citibank to issue a clean letter of credit in support of that guarantee.

The defendant banks thus did not breach their contract with Acoustical when they honored the draw made by SAMBA.  Under the unambiguous terms of the agreement to which Acoustical assented, the defendant banks were required to pay upon demand.  Consequently, no issue of fact remains as to whether the defendant banks breached their contract with Acoustical.

**B.**

McCormack's second theory as to why summary judgment is inappropriate centers on his claim that the defendant banks breached a duty that they owed to Acoustical.  McCormack asserts that the defendant banks were negligent because they structured the maintenance guarantee in a way contrary to the desires of Acoustical.

We see no merit in this claim because Carlson expressly approved in writing the structure of the maintenance guarantee after consulting with McCormack, Acoustical's legal counsel. In addition, the earlier performance guarantee, which Acoustical seems to have found acceptable, was structured in precisely the same way; there too, Citibank issued a clean sight credit. Finally, Acoustical even approved, without complaint, a series of amendments extending the date of both SAMBA's maintenance guarantee and Citibank's letter of credit in support of that guarantee.

The defendant banks therefore had every reason to believe that the maintenance guarantee was structured in a manner that was satisfactory to Acoustical. Furthermore, the obligation of an issuer of a letter of credit to its customer "does not include liability or responsibility . . . for any act or omission of any person other than itself or its own branch . . . ." Neb. Rev. Stat. U.C.C. § 5-109(1)(b). Here, the relevant act or omission was on the part of Acoustical for not telling the defendant banks that they had entirely and repeatedly missed what was allegedly a fundamental element of the transaction from Acoustical's perspective. McCormack's theory of negligence thus fails to raise a genuine issue of fact because McCormack presents no evidence that even suggests that the defendant banks did not follow Acoustical's instructions precisely.

McCormack next asserts that the defendant banks breached what amounted to a fiduciary duty that they owed to Acoustical. Under Nebraska law, "[a] fiduciary duty arises out of a confidential relationship which exists when one party gains the confidence of the other and purports to act or advise with the other's interest in mind." Wolf v. Walt, 530 N.W.2d 890, 898 (Neb. 1995). McCormack points to the relationship between the defendant banks and Acoustical and argues that the banks had a fiduciary duty to, in effect, make it absolutely clear to Carlson that, under the terms of the May 13 telex, Citibank would be obligated to pay SAMBA

-14-

upon demand, regardless of whether a Certificate was ever issued. According to McCormack, because the defendant banks failed to make this point clear to Carlson, the defendant banks breached a duty they owed to Acoustical when they told Carlson that the May 13 changes were merely administrative.[4]

McCormack provides no foundation for the existence of this fiduciary duty. His assertion, moreover, contrasts sharply with the presumption under Nebraska law that ordinarily "the relationship between a bank and a customer . . . imposes no fiduciary duty upon the bank." Chase v. Deneau, 1993 WL 70947, at *2 (Neb. Ct. App. Mar. 16, 1993); see also Bloomfield v. Nebraska State Bank, 465 N.W.2d 144, 149 (Neb. 1991) (no fiduciary relationship even where bank was nearly in complete control of customer's financing ability); Terry A. Lambert Plumbing, Inc. v. Western Sec. Bank, 934 F.2d 976, 984 (8th Cir. 1991) (construing Bloomfield to hold that bank did not owe fiduciary duty to customer whom it advised in business and financial matters); Nelson v.

---

[4]From the perspective of the defendant banks, it was not unreasonable to view this change as merely administrative. The defendant banks were originally asked to arrange for SAMBA to issue a maintenance guarantee, but were handed a draft of a guarantee that called for Citibank to issue the maintenance guarantee. Therefore, insofar as the May 13 telex called for a clarification that SAMBA, not Citibank, was to issue the maintenance guarantee, the May 13 amendments were merely administrative.

McCormack contends that the May 13 telex constituted more than a mere administrative change because the banks removed the documentary requirement of Citibank's letter of credit. However, Acoustical at no point requested a documentary requirement to attach to any link in the chain of payments other than to the guarantee itself. Therefore, it was not unreasonable for the defendant banks to conclude that nothing of substance was changed by the May 13 telex. SAMBA, as issuer of the maintenance guarantee, was still obligated to refrain from paying unless a Certificate was first issued. Acoustical never informed the defendant banks that they were supposed to arrange a documentary guarantee as well as have Citibank issue a documentary letter of credit.

-15-

Production Credit Ass'n of the Midlands, 729 F. Supp. 677, 685 (D. Neb. 1989) (no fiduciary duty owed by credit association to its borrowers), aff'd, 930 F.2d 599 (8th Cir.), cert. denied, 502 U.S. 957 (1991); cf. Wright & Souza, Inc. v. DM Properties, 510 N.W.2d 413, 417 (Neb. Ct. App. 1993) (no agency, and hence no fiduciary relationship, where loan brokerage service agreed to obtain financing for real estate developer). This presumption can be rebutted when (1) a customer "who is in a position of inequality, dependence, weakness, or lack of knowledge reposes trust or confidence in his or her banker" and (2) "the relationship results in the bank's dominion, control, or influence" over the affairs of the customer. Chase, at *2 (citing Garrett v. BankWest, Inc., 459 N.W.2d 833, 838-39 (S.D. 1990) (applying similar standard to find that bank owed no fiduciary duty to one of its customers, an experienced businessman-rancher-farmer)); accord Bloomfield, 465 N.W.2d at 149 ("[S]uperiority alone does not create a fiduciary duty. There must also be an opportunity to influence.").

Acoustical was not in a position of inequality, dependence, weakness, or lack of knowledge relative to the defendant banks. Instead, Acoustical was a corporation engaged in an international construction project and was represented by its own legal counsel. Acoustical had negotiated its contract with Obaid and had helped to negotiate and draft the basic terms of the two guarantees required by Obaid. Furthermore, McCormack has provided no evidence that the defendant banks exercised dominion, control, or influence over Acoustical. The defendant banks helped to structure the transaction, but throughout their dealings with Acoustical, Carlson and McCormack were always consulted and remained in a position to approve or disapprove of the structure proposed.

We can therefore rule as a matter of law that the defendant banks did not owe a fiduciary duty to Acoustical. See Bloomfield, 465 N.W.2d at 149 (claim of breach of fiduciary duty failed as a matter of law). Since no duty existed, McCormack's claim that the

-16-

defendant banks breached a fiduciary duty can raise no issues of fact.  Cf. Lange Indus., Inc. v. Hallam Grain Co., 507 N.W.2d 465, 476 (Neb. 1993) ("The elements of a negligence action are duty, breach, proximate cause, and damages.").

## III.

### A.

McCormack argues that the district court erred by granting the defendant banks' motion for summary judgment without holding oral argument or scheduling a hearing.  We disagree.

A district court is not always required to hold oral argument before granting a motion for summary judgment under Fed. R. Civ. P. 56(c).  See Clark Equip. Credit Corp. v. Martin Lumber Co., 731 F.2d 579, 581 (8th Cir. 1984) ("Fed. R. Civ. P. 56 does not require a hearing in the absence of a prior request."); see also Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments sua sponte, so long as the losing party was on notice that she has to come forward with all of her evidence.").  Moreover, oral argument is deemed waived where the nonmoving party neither requests a hearing nor requests that consideration of the motion be deferred until discovery is completed, despite ample time to make such a request.  Cf. Deutsch v. Burlington Northern R.R., 983 F.2d 741, 744 n.2 (7th Cir. 1992) ("Fed. R. Civ. P. 56(c) does not require a hearing, and oral argument is deemed to be waived when the opposing party does not request it."), cert. denied, 507 U.S. 1030 (1993).

Here, McCormack neither requested oral argument nor requested, at any time, that consideration of the motion be deferred until discovery was completed, despite having more than five and one-half months in which to do so.

**B.**

McCormack also appeals the district court's decision denying his motion for relief from judgment under Fed. R. Civ. P. 60(b) or, in the alternative, for a new trial under Fed. R. Civ. P. 59(a) or, in the alternative, to alter or amend a judgment under Fed. R. Civ. P. 59(e). We affirm.

"A Rule 60(b) motion is committed to the sound discretion of the trial court, and we review the district court's decision to grant or deny the motion only for an abuse of discretion." MIF Realty L.P. v. Rochester Assocs., 92 F.3d 752, 755 (8th Cir. 1996). To prevail on a Rule 60(b)(2) motion, the moving party must show: "(1) that the evidence was discovered after trial; (2) that the party exercised due diligence to discover the evidence before the end of trial; (3) that the evidence is material and not merely cumulative or impeaching; and (4) that a new trial considering the evidence would probably produce a different result." Atkinson v. Prudential Property Co., 43 F.3d 367, 371 (8th Cir. 1994). In the context of this summary judgment motion, we feel that, even if McCormack could demonstrate that he has met the first three conditions, he has not met the fourth.

To support his claim, McCormack points to evidence that was not before the district court when it granted summary judgment and argues that this evidence raises a factual issue with respect to whether the terms of the letter of credit/guarantee arrangement were ambiguous. We find that this evidence merely suggests that the parties have opposing views with respect to the meaning of the May 13 telex.

For example, McCormack points (1) to a July 27-28, 1995 deposition of Gerald E. Carlson and (2) to the April 28, 1995 affidavit of Dr. Boris Kozolchyk. While we find it difficult to see how this evidence is new, given the fact that the district

-18-

court's summary judgment motion was not filed until September 25, 1995, well after the date that this testimony was taken, we also fail to see how this evidence would have changed the outcome of the summary judgment motion.

The testimony of Carlson only reveals that he did not understand the significance of the May 13 telex but approved it anyway. The expert opinion of Dr. Kozolchyk merely demonstrates that the language of the May 13 telex, if added to a preexisting letter of credit, may have been confusing. Dr. Kozolchyk's testimony does not undermine our earlier conclusion that the May 13 telex was an unambiguous amendment.

McCormack also points to a March 28, 1983 letter from Obaid to SAMBA in which Obaid calls for the cancellation of SAMBA's "Letter of Guarantee No. CU230328 dated 12.12.1981." II Appellant's App. at 62, Ex. 2. Because "CU230328" was also used in the May 13 telex to reference the maintenance guarantee, McCormack argues that this letter raises a factual issue as to whether the Citibank letter of credit was cancelled approximately two months before Carlson approved the May 13 telex. McCormack hopes to show that Carlson could not have approved a cancelled letter of credit.

This argument is unpersuasive. Obaid's March 28, 1983 letter clearly refers to the earlier performance guarantee, which was to be replaced by the maintenance guarantee. It is therefore understandable that Obaid would call for the cancellation of the performance guarantee in anticipation of the issuance of the maintenance guarantee. Moreover, Carlson approved in writing a series of amendments that extended the expiration date of both SAMBA's guarantee and Citibank's letter of credit.

For the same reasons that we reject McCormack's appeal of the district court's Rule 60(b)(2) decision, we also reject McCormack's Rule 59(a) and 59(e) appeals.

**IV.**

The district court is affirmed.

A true copy.

    Attest:

        CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.