# United States Court of Appeals

### For the Eighth Circuit

_____

No. 20-1956

_____

Laredo Ridge Wind, LLC; Broken Bow Wind, LLC; Crofton Bluffs Wind, LLC

*Plaintiffs - Appellees*

v.

Nebraska Public Power District

*Defendant - Appellant*

------------------------------

Nebraska Public Power District

*Counter Claimant - Appellant*

v.

Laredo Ridge Wind, LLC; Crofton Bluffs Wind, LLC; Broken Bow Wind, LLC

*Counter Defendants - Appellees*

------------------------------

Nebraska Public Power District

*Third Party Plaintiff - Appellant*

v.

Elkhorn Ridge Wind, LLC, a Delaware Limited Liability Company

*Third Party Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: March 18, 2021
Filed: August 24, 2021

_____

Before GRUENDER, BENTON, and GRASZ, Circuit Judges.

_____

GRASZ, Circuit Judge.

Nebraska Public Power District ("NPPD") appeals the district court's[1] grant of summary judgment in favor of four of NPPD's wind-farm affiliates. NPPD argues that these affiliates breached their power purchase agreements by transferring control of their parent companys' ownership interests without NPPD's written consent. We affirm.

## I. Background

NPPD is a public utility company that provides electric power throughout most of the state of Nebraska. Starting in 2008, NPPD entered into power purchase agreements ("PPAs") with Elkhorn Ridge Wind, LLC ("Elkhorn"); Laredo Ridge Wind, LLC ("Laredo"); Broken Bow Wind, LLC ("Broken Bow"); and Crofton Bluffs Wind, LLC ("Crofton") (collectively, the "Project Entities"). Each Project Entity owns and operates its own wind-energy-generation facility. Under the PPAs,

_____

[1]The Honorable Joseph F. Bataillon, United States District Judge for the District of Nebraska.

NPPD agreed to purchase all of the energy produced by the Project Entities for a period of twenty years.

Each Project Entity sits at the bottom of a multi-tiered ownership structure that includes many subsidiary holding companies. The Project Entities were initially built, owned, operated, and maintained by Edison Mission Energy, a Delaware corporation ("Edison"). From their inception, the Project Entities have outsourced the performance of their operation and maintenance duties to third parties.

Each of the PPAs contains an identical change-of-control provision requiring NPPD's written consent for any Project Entity to transfer a majority of its "direct ownership interests" to a non-Edison entity. Each PPA also contained anti-assignment provisions, prohibiting the Project Entity from assigning the PPA "or any of its rights or obligations under" the PPA.

In 2012, Edison filed for bankruptcy protection. In the course of the bankruptcy case, NRG Energy, Inc. ("NRG") purchased Edison and all of the Edison affiliates tasked with operating the Project Entities. The entities that were sold and transferred between Edison and NRG were "upstream of the Project Entities by many tiers of intermediate ownership." The Project Entities became subsidiaries of NRG Energy Gas & Wind Holdings, Inc., even though the Project Entities never obtained NPPD's written consent for the NRG transaction.

In 2018, NRG sold its Zephyr Renewables LLC[2] subsidiary, a parent of the Project Entities, to Global Infrastructure Partners ("GIP"). The entities transferred

---

[2]NRG Energy Gas & Wind Holdings, Inc. was an upstream parent company of the Project Entities. At the time of the GIP transaction, JPM Capital Corporation held 100% of its Class A interests, and NRG Yield Operating LLC acquired 100% of its Class B interests. After the GIP transaction, NRG Yield Operating LLC changed its name to Clearway Energy Operating LLC. Clearway Energy Operating LLC is a subsidiary of Clearway Energy Group, which was formerly named Zephyr Renewables LLC.

-3-

between NRG and GIP were also "upstream of the Project Entities by many tiers of intermediate ownership." The Project Entities never obtained NPPD's written consent for the GIP transaction either.

After the GIP transaction, NPPD served notices of default on each Project Entity, seeking termination of each of the PPAs. NPPD stated that the Project Entities caused an event of default during both the 2014 NRG acquisition and the 2018 GIP acquisition.

Three of the Project Entities (Laredo, Broken Bow, and Crofton) sued NPPD seeking (1) a declaratory judgment that they did not breach the change-of-control provision, and (2) an injunction preventing NPPD from terminating the PPAs. NPPD filed a third-party petition to bring the fourth Project Entity, Elkhorn, into the case, which the district court granted.

The Project Entities filed a motion for summary judgment. The district court granted the Project Entities' summary judgment motion, concluding that the NRG and GIP transactions involved transfer of ownership interests in the Project Entities' upstream parents, not the Project Entities themselves, which did not breach the PPAs. The district court also granted the Project Entities' request for a permanent injunction. NPPD now appeals.

## II. Discussion

We review the district court's grant of summary judgment de novo. *Johnson v. City of Shorewood*, 360 F.3d 810, 817 (8th Cir. 2004). Summary judgment is appropriate when, in viewing the evidence in the light most favorable to the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Guardian Fiberglass, Inc. v. Whit Davis Lumber Co.*, 509 F.3d 512, 515 (8th Cir. 2007).

We review the district court's award of a permanent injunction for abuse of discretion. *Forest Park II v. Hadley*, 336 F.3d 724, 731 (8th Cir. 2003). "Abuse of discretion occurs if the district court reaches its conclusion by applying erroneous legal principles or relying on clearly erroneous factual findings." *Id.*

## A. Change of Control

### 1. Contract Interpretation

Nebraska law governs this appeal. Under Nebraska law, "a court faced with a question of contract interpretation must first determine whether the contract is ambiguous." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 498 (8th Cir. 2013); *accord City of Sidney v. Mun. Energy Agency of Neb.*, 917 N.W.2d 826, 843 (Neb. 2018). "[T]he determination of whether a contract is ambiguous is a matter of law." *McCormack v. Citibank, N.A.*, 100 F.3d 532, 538 (8th Cir. 1996); *accord Big River Const. Co. v. L & H Props., Inc.*, 681 N.W.2d 751, 756 (Neb. 2004) ("The meaning of a contract, and whether a contract is ambiguous, are questions of law."). A court determines whether ambiguity exists on an objective basis, reviewing the contract as a whole. *See Home Instead*, 721 F.3d at 498; *accord Big River*, 681 N.W.2d at 756 ("A contract must be construed as a whole, and, if possible, effect must be given to every part thereof.").

"'A written contract which is expressed in clear and unambiguous language is not subject to interpretation or construction,' and a court simply must give effect to that language." *Home Instead*, 721 F.3d at 498; *accord McCormack*, 100 F.3d at 538; *accord City of Sidney*, 917 N.W.2d at 843. "[T]here is a strong presumption that a written instrument correctly expresses the intention of the parties" and "parties are bound by the terms of the contract even though their intent may be different from that expressed in the agreement." *Bedrosky v. Hiner*, 430 N.W.2d 535, 539 (Neb. 1988).

"A contract is only ambiguous 'when the instrument at issue is susceptible of two or more reasonable but conflicting interpretations or meanings.'" *McCormack*, 100 F.3d at 538 (quoting *Boyles v. Hausmann*, 517 N.W.2d 610, 615 (Neb. 1994)); *see also Home Instead*, 721 F.3d at 498. Ambiguity in a contract creates a question of fact. *Home Instead*, 721 F.3d at 499 ("When it is established that a contract is ambiguous, the meaning of its terms is a matter of fact to be determined in the same manner as other questions of fact."); *Bedrosky*, 430 N.W.2d at 540 ("When it is established that a contract is ambiguous, . . . summary judgment is improper.").

Each of the PPAs contains a "Permitted Transactions" provision stating:

Seller shall not: (a) consolidate or merge with any other Person, or reorganize, consolidate, Change Control or change the form of [Project Entities'] business organization from a limited liability company; . . . or (c) assign this Agreement, or any of its rights or obligations under this Agreement (each, a "Transaction") to any Person (the "Transferee"), whether in a single transaction or series of transactions, unless such Transaction is expressly approved in writing by NPPD . . . and any Transaction in the absence of such consent shall be void and of no legal effect.

"Change Control" means the sale or transfer after the Effective Date of a majority of the direct ownership interests in Seller. . . .

No assignment or transfer of this Agreement shall relieve a Party of its obligations hereunder.

Further, each PPA states that a change-of-control transaction performed without NPPD's written approval qualifies as an event of default.

## 2. Ownership Interests

NPPD argues the change-of-control provision is ambiguous because the term "direct ownership interests" is subject to multiple interpretations. The Project Entities counter that the term "direct ownership interests" has a common,

unambiguous meaning, which was properly considered by the district court in its decision to grant summary judgment in the Project Entities' favor. We conclude that the term "direct ownership interests" is unambiguous.

It is undisputed that the PPAs do not define "direct ownership interests." However, the law supports the Project Entities' argument that here "ownership interests" and certainly "direct ownership" can only be reasonably interpreted to mean ownership of membership units in a limited liability company.

NPPD primarily relies on the dissent in *Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003), to argue that ownership encompasses a wide variety of interests. NPPD's argument is misplaced for two reasons. First, as a dissenting opinion it is not controlling precedent. We will not conjure up ambiguity from the *Dole* dissent when none exists. Second, the *Dole* majority opinion, while helpful in identifying the common meaning of "ownership," has limited value due to the term's interpretation solely within the context of the Foreign Sovereign Immunities Act of 1976 ("FSIA").

Ownership of a corporation or LLC is generally defined by the legal right of possession of stock or membership units, not control. In *Dole*, the Supreme Court addressed the issue of whether a party's ownership of shares of a parent company (several entities removed from the subject company) qualified as "direct ownership." *Dole*, 538 U.S. at 470–74. However, the *Dole* analysis was in the context of interpreting the FSIA to determine whether a lawsuit could be removed to federal court. *Id.*

In stating that ownership of an entity several levels removed from the target entity did not qualify as direct ownership for purposes of the FSIA, the *Dole* majority stated that "[a]n individual shareholder, by virtue of his ownership of shares, does not own the corporation's assets and, as a result, does not own subsidiary corporations in which the corporation holds an interest." *Dole*, 538 U.S. at 475. "A basic tenet of American corporate law is that the corporation and its shareholders are

distinct entities." *Id*. at 474. Further, "[a] corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary; and, it follows with even greater force, the parent does not own or have legal title to the subsidiaries of the subsidiary." *Id*. at 475.

NPPD relies on comments raised in the *Dole* dissent as the basis for its argument that "ownership interests" is an ambiguous term. The *Dole* dissent recognized that owning the shares of a corporate parent differs from owning the shares of a corporate subsidiary. *Dole*, 538 U.S. at 481. The *Dole* dissent argued instead that the term "ownership" should be interpreted to apply to ownership interests of a corporation's parent entity. That interpretation, they argued, aligns with the Court's historically expansive use of the term "ownership" to apply to a variety of ownership situations. *Id*. at 481–82.

Next, NPPD argues GIP's ownership of the Project Entities' parent corporations improperly manifested itself in GIP's control over the Project Entities themselves. NPPD's argument finds some support in the Supreme Court's case law. The Court has explained that a corporate parent often has a degree of control over its subsidiaries:

> [A] parent and a wholly owned subsidiary *always* have a complete 'unity of purpose or a common design interest. They share a common purpose whether or not the parent keeps a tight rein over the subsidiary; the parent may assert full control at any moment if the subsidiary fails to act in the parent's best interests.

*Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771–72 (1984) (referring to the Sherman Act); *see also United States v. Bestfoods*, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation (*so-called because of control through ownership of another corporation's stock*) is not liable for the acts of its subsidiaries.") (emphasis added) (citations omitted).

But *Dole* clarified that control and ownership are distinct concepts. *See Dole*, 538 U.S. at 477; *see also Janvey v. Libyan Inv. Auth.*, 840 F.3d 248, 259 (5th Cir. 2016). "[A] parent corporation and its subsidiary are separate corporate forms." *In re Packaged Seafood Prod. Antitrust Litig.*, 338 F. Supp. 3d 1118, 1143 (S.D. Cal. 2018). Thus, ownership of intermediate corporate entities is not direct ownership.

The Supreme Court of Nebraska has not interpreted the term "direct ownership interest" in analyzing a contract. However, in interpreting a Nebraska statute, that court has defined "direct" as "'stemming immediately from a source,' 'natural, straightforward,' 'marked by absence of an intervening agency, instrumentality, or influence,' 'characterized by close logical, causal, or consequential relationship' and 'free from extraneous influence; immediate.'" *Jacobitz v. Aurora Coop.*, 865 N.W.2d 353, 359–60 (Neb. 2015) (cleaned up); *see also State v. Gilliam*, 874 N.W.2d 48, 57 (Neb. 2016) ("We often turn to dictionaries to ascertain a word's plain and ordinary meaning."). Eighth Circuit precedent has also used the phrase "direct ownership" when referring to ownership of stock. *Wright v. United States*, 482 F.2d 600, 609 (8th Cir. 1973).

In this case, we give the "direct ownership" contemplated under the change-of-control provision its common meaning. We interpret the direct ownership interests to mean ownership interest in the Project Entities themselves, and we conclude that ownership in any of the Project Entities' parent companies constitutes an indirect ownership interest.[3]

### 3.  Sale Transactions

Next, we must determine whether the NRG and GIP transactions caused the Project Entities to violate the PPAs. Based on the PPAs' plain terms, we conclude

---

[3]In this case, we apply the same principles to LLCs as used in cases dealing with corporations. *Streck, Inc. v. Ryan Fam.*, *L.L.C.*, 901 N.W.2d 284, 293 (Neb. 2017) ("[W]e have generally treated actions by a member of an LLC in the same manner as actions by a shareholder of a corporation.").

that the Project Entities did not transfer their direct ownership interests to NRG or GIP and did not violate the change-of-control provision of the PPAs.

The transfer of the ownership interests of the Project Entities' parent companies did not trigger the change-of-control provision in the PPAs. *Engel v. Teleprompter Corp.*, 703 F.2d 127, 134 (5th Cir. 1983) ("[T]ransfer of the stock of a parent corporation does not affect the ownership of assets held by a subsidiary."). Traditionally, a corporate parent who owns shares of a subsidiary does not own or have legal title over the subsidiary's assets. *See Janvey*, 840 F.3d at 263–64 ("A corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary."). Corporate parents are separately established and must be treated accordingly. *See Engel*, 703 F.2d at 134 ("[O]wnership of the stock of a corporation is not synonymous with ownership of the corporate assets."); *Janvey*, 840 F.3d at 263–64 ("Subsidiaries that are 'established as juridical entities distinct and independent . . . should normally be treated as such.'") (abrogated on other grounds).

We conclude that the transfer of the Project Entities' parent companies, from Edison to NRG to GIP, did not transfer the "direct ownership interests" of each of the Project Entities. Thus, we conclude that the Project Entities did not need to obtain NPPD's written consent for each of the transactions involving its upstream parent companies, and that the transfer of the ownership interests at the parent-company level did not trigger a change of control under the PPAs.

## B. Assignment

NPPD also argues that the PPAs include anti-assignment clauses that prevented the Project Entities from assigning or delegating any of their rights or obligations under the PPAs without NPPD's consent. According to NPPD, the Project Entities violated these anti-assignment clauses (and thus breached the PPAs) by delegating to third-party affiliates the performance of, and control over, tasks the Project Entities agreed to perform. For example, NPPD maintains that the Project

-10-

Entities failed to fulfill their contractual duties to "operate and maintain the Plant and Site" and abdicated their responsibilities by turning over the day-to-day operations and management to a third party with whom NPPD had no contractual agreement.

In response, the Project Entities contend they did not assign away their rights or obligations because (1) they delegated (not assigned) tasks under the PPAs; (2) delegation of tasks was not expressly prohibited by the PPAs; and (3) the Project Entities have remained directly liable for their obligations under the PPAs. We agree with the Project Entities interpretation of the anti-assignment clause.

Under Nebraska law "parties should generally be free to assign rights and delegate duties as they see fit, subject to certain limitations." *Eques. Ridge Homeowners Assoc. v. Eques. Ridge Estates II Homeowners Assoc.*, 953 N.W.2d 16, 35 (Neb. 2021). "At common law '[c]ontract duties are generally delegable, unless prohibited by statute, public policy or the terms of the contract.'" *Id.* (quotation omitted).[4]

Here, NPPD claims the delegation of certain obligations violated section 10.2.1(c) of the PPAs, which, as relevant, provide that the Project Entities "shall not assign [the PPA] or any of its rights or obligations under [the PPA] . . . unless such transaction is expressly approved in writing by NPPD[.]" But two observations lead us to reject NPPD's position.

First, we note the plain language of the anti-assignment provision does not prohibit the *delegation of duties*, but instead only the *assignment of obligations*. It is not at all clear that, by including this imprecise phrase, the parties intended to forbid the delegation of the performance of all tasks. A more plausible interpretation

---

[4]"Contractual duties are also not delegable if they involve the personal qualities or skills of the obligor, in the absence of consent by the obligee." *Eques. Ridge*, 953 N.W.2d at 35 (quotation omitted). We see no basis to conclude the operation of an energy producing wind facility was a personal service.

-11-

of the anti-assignment provision is that the parties intended to prohibit the Project Entities from transferring their legal obligations to perform duties as specified in the PPAs. There is no evidence in the record that the Project Entities transferred any of their legal obligations under the PPAs. To the contrary, at all times the Project Entities were obligated to perform their obligations as set forth in the PPAs— whether or not they had other entities assist in performing certain duties in operating the wind facilities.

Second, examination of the specific contractual obligations that NPPD claims were improperly turned over to third parties reveals that the Project Entities' delegation of tasks to affiliates was consistent with the terms of the PPA.[5] For example, NPPD highlights the fact that third parties operated and maintained the wind facilities. But section 4.2 of the PPAs obligated the Project Entities "to construct, solely own, operate and maintain the [wind facility] in a manner which will at all times meet the requirements of [the PPAs]." As the district court aptly recognized, "[a]t no point did the Project Entities delegate the ultimate responsibility for these duties to any third party. If the PPAs were intended to require the Project Entities to 'solely' meet each enumerated obligation, such as operation of the [wind facility], then the term 'solely' would have preceded each such verb or headed the list of verbs." But the PPAs were not written in such a manner, revealing the parties did not understand the PPAs to forbid the Project Entities from delegating certain tasks, so long as they remained ultimately responsible for their promised contractual obligations.

For these reasons, we agree with the district court's conclusion that "the Project Entities did not violate section 10.1 or 4.2 by delegating performance of

---

[5]Indeed, as NPPD explained at oral argument, the parties performed with the understanding that tasks associated with running the wind facilities would be delegated to upstream affiliates of the Project Entities. Oral Arg. 39:14-40:00. The problem, in NPPD's view, was only that the upstream affiliates to which tasks were delegated became Clearway Energy Group. *Id.*

-12-

certain duties, because the Project Entities remain ultimately responsible for their obligations."

## C. Injunction

NPPD also argues for reversal of the district court's permanent injunction order. The court reviews issuance of permanent injunctions for abuse of discretion. *Forest Park II*, 336 F.3d at 731. An issuing court must consider: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties; (3) whether the movant proves actual success on the merits; and (4) the public interest." *Id.*

We conclude that the district court did not abuse its discretion in issuing a permanent injunction to prevent NPPD from terminating the PPAs. The Project Entities convincingly argued that termination of the PPAs would cause irreparable harm by both creating events of default with the Project Entities' multiple investors and requiring the Project Entities to immediately pursue bankruptcy relief. Second, in balancing the harms, the Project Entities bear the greater weight of the harm, as termination of the PPAs would eliminate the Project Entities' only customer, NPPD, and only source of income. Third, for the reasons discussed above, the Project Entities have proven success on the merits because they did not breach the express terms of the PPAs. Finally, there is a strong argument that the public interest favors the preservation of the Project Entities over allowing NPPD to escape the benefit of the bargain. Accordingly, we uphold the district court's permanent injunction.

## III. Conclusion

The judgment of the district court is affirmed.

_____