WILLIAM WOLF, APPELLANT, V. DELBERT WALT AND MICHAEL RAINWATER, APPELLEES.

530 N.W.2d 890

Filed April 27, 1995.   No. S-93-716.

Michael J. Mooney and Michael J. Whaley, of Gross & Welch, P.C., for appellant.

Denise E. Frost, of Domina & Copple, P.C., for appellees.

WHITE, C.J., CAPORALE, FAHRNBRUCH, LANPHIER, WRIGHT, and CONNOLLY, JJ.

LANPHIER, J.

Plaintiff–appellant, William Wolf, entered into a dairy lease agreement with Flat Top. Dairy, Inc., in August 1989. Defendant–appellee Delbert Walt was the president and principal shareholder of Flat Top. Pursuant to the agreement, Flat Top leased and managed Wolf's cattle. Flat Top paid monthly rent to Wolf. Defendant–appellee Michael Rainwater was employed by Flat Top to manage the dairy cattle herd. Flat Top ceased making the required payments to Wolf after approximately 1 year. Wolf filed a petition in the district court for Cuming County and asserted that Flat Top's corporate identity should be disregarded and that Walt should be held personally liable for Flat Top's debt to Wolf. Before submission of the matter to the jury, the district court directed a verdict in favor of the defendants on three tort claims Wolf asserted. Following the trial, the jury refused to hold Walt personally liable. The district court entered judgment in favor of the defendants. The district court correctly granted directed verdicts for the defendants on the three tort claims. Wolf failed to prove by a preponderance of the evidence that Flat Top's corporate

identity should be disregarded. We affirm the district court's judgment.

## BACKGROUND

Flat Top's dairy lease program involved the lease of dairy cattle to Flat Top. The cows were to be purchased for Wolf by Walt, who was a buyer. Pursuant to the program, Wolf leased 40 head of dairy cows at a designated value of $1,000 per cow to Flat Top for a 5-year term. Flat Top agreed to pay Wolf $24 per month per head, totaling $960. On August 2, 1989, Wolf wired Flat Top $40,000, and sometime during that month, Walt purchased the cows and transported them to Flat Top. Rainwater testified that two of Wolf's cows died shortly after arriving at Flat Top. The remaining 38 cows were tagged in order to identify them as Wolf's.

In addition to his interest in Flat Top, Walt was a cattle order buyer. From January 1989 through June 1991, Walt traveled extensively in order to select and buy cattle on behalf of his customers. Rainwater managed the day-to-day operations, and Walt checked on the dairy's status by phone several times a week. Walt testified that Rainwater assured him that everything at the dairy was okay.

Pursuant to the lease agreement, Wolf received payments of $960 per month from Flat Top from October 1989 through December 1990. The source of the payments was the income from the sale of milk. From January through May 1991, Wolf did not receive the scheduled payments due him. Wolf repeatedly asked Rainwater about the overdue payments, and Rainwater advised him that the payments were delayed due to a change in milk companies. In June and July 1991, Wolf received his scheduled monthly payments.

In August 1991, Walt visited Flat Top and toured the premises. Walt testified that during this tour he discovered that the Flat Top herd was dramatically diminished and that many of the remaining cows were very thin or diseased. Only 19 of Wolf's 40 cows remained. Walt immediately fired Rainwater.

Walt stated that Wolf's remaining cows were so thin and diseased that he sold them for slaughter. On August 10, 1991, Walt tendered the proceeds of the sale, $10,424.62, to Wolf.

Walt made no further payments under the lease.

Apparently, the total dairy herd maintained at Flat Top numbered approximately 680 cows. However, inconsistent testimony was adduced regarding the size of the herd. The lease agreement provided that cows and calves would be culled from the herd as necessary. The proceeds of the sale of culled cows and calves were to be placed in an escrow account designated as the "herd replacement account." Culled cows were to be replaced. Rainwater testified that the goal was to maintain the size of the herd at its original level.

In his deposition in May 1992, Rainwater testified that approximately 30 percent of the cows were culled from the herd per year. Rainwater referred to records during his deposition that identified the culled cattle but testified that no records existed which would identify replacement cattle. The records used during Rainwater's deposition are not a part of the record before us.

Rainwater estimated during his deposition that about 180 cows were culled during the first year of Flat Top's existence. No distinction was made between Wolf's cows and the rest of the herd when culling. Rainwater also testified that only 60 cows were added to the herd and that none of the cows were added to Wolf's tagged herd. Rainwater testified that the proceeds of the sale of cows and calves were not sufficient to replace the culled cattle.

Although the herd replacement account was designated as an "escrow account," no third party held the funds. Walt was the only party authorized to sign checks on the account, and those funds were to be used only to replace culled cattle. Walt used over $30,000 in funds from the herd replacement account for purposes other than the purchase of cattle. However, Walt testified that approximately $17,260 out of the $30,000 from the replacement account was used to repay loans obtained for the purchase of cattle. The remaining funds were used to pay phone bills and taxes and to purchase feed in December 1990. Walt testified that he used the herd replacement account for these expenses because Rainwater had overdrawn the dairy's general account.

Walt testified that he made deposits into the herd replacement

account and that he believed Rainwater was also depositing the proceeds of all sales of culled cattle. Walt suspected that Rainwater may not have been depositing all of the proceeds in mid-1990. Walt questioned Rainwater, and Rainwater told him that he had needed the funds to buy feed. Rainwater agreed not to divert funds from the replacement account in the future.

On October 1, 1991, Wolf filed a lawsuit in the district court against Walt, Rainwater, and Flat Top. In his petition, Wolf alleged that the three defendants had failed to make the payments due under the lease and that the defendants had converted his cattle. Defendants Walt and Rainwater demurred and argued that the court lacked subject matter jurisdiction, that the causes of action were improperly joined, and that the petition failed to state facts sufficient to constitute a cause of action. By its order filed April 6, 1992, the district court sustained the defendants' demurrer and granted Wolf leave to file an amended petition.

Wolf's second amended petition named only Walt and Rainwater as defendants. Wolf alleged four causes of action: conversion, constructive fraud, breach of contract, and bailment. Wolf further alleged that Walt operated Flat Top as a facade for his personal business enterprises and asked the court for an order disregarding Flat Top's corporate identity.

Although Rainwater gave deposition testimony in this case in May 1992, he did not appear personally at trial, nor did counsel or any other person represent him after he demurred to Wolf's first petition.

The case went to trial before a jury on July 19, 1993. At the close of all evidence, both Wolf and Walt moved for directed verdicts on all of the causes of action. The district court overruled Wolf's motions but sustained Walt's motions for directed verdict on the conversion, constructive fraud, and bailment causes of action. The issues of breach of contract and piercing the corporate veil were given to the jury. The jury returned a verdict in favor of Walt and Rainwater. On August 6, the district court rendered judgment on the jury's verdict. Wolf timely appealed, and by order of this court the matter was removed from the Nebraska Court of Appeals' docket to this court.

## ASSIGNMENTS OF ERROR

Wolf argues that the district court erred in failing to disregard the corporate entity of Flat Top and hold it to be the alter ego of its principal shareholder, Walt. Wolf argues that the district court erred by failing to direct a verdict in his favor on his cause of action for breach of contract and by granting Walt's motions for directed verdict on the causes of action for bailment, conversion, and constructive fraud. Finally, Wolf argues that the district court erred in receiving an exhibit without proper identification or foundation and that the exhibit constituted hearsay.

## STANDARD OF REVIEW

Proceedings seeking disregard of the corporate entity to impose liability on a shareholder for a corporation's debt or other obligation are equitable actions. An appeal of such a matter is reviewed de novo on the record, and the appellate court is required to reach factual findings independent of the trial court. *Global Credit Servs. v. AMISUB*, 244 Neb. 681, 508 N.W.2d 836 (1993); *Southern Lumber & Coal v. M. P. Olson Real Est.*, 229 Neb. 249, 426 N.W.2d 504 (1988); *ServiceMaster Indus. v. J.R.L. Enterprises*, 223 Neb. 39, 388 N.W.2d 83 (1986).

Generally, a jury verdict will not be set aside unless clearly wrong, and it is sufficient if any competent evidence is presented to the jury upon which it could find for the successful party. *Nichols v. Busse*, 243 Neb. 811, 503 N.W.2d 173 (1993); *Kozeny v. Miller*, 243 Neb. 402, 499 N.W.2d 75 (1993). However, a jury empaneled in an equitable action, such as this, serves only in an advisory role, and its findings are not binding on the trial court. *Synacek v. Omaha Cold Storage, ante* p. 244, 526 N.W.2d 91 (1995). In an appeal of an equitable action, an appellate court tries the factual issues de novo on the record and reaches its conclusions independent of the trier of fact. *Id.*

In reviewing the action of a trial court, an appellate court must treat a motion for directed verdict as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed. The party against whom the motion is directed is entitled to have every controverted fact

resolved in his favor and to have the benefit of every inference which can reasonably be deduced from the evidence. In order to sustain a motion for directed verdict, the court resolves the controversy as a matter of law and may do so only when the facts are such that reasonable minds can draw but one conclusion from the evidence. *Kroeger v. Ford Motor Co.*, *ante* p. 323, 527 N.W.2d 178 (1995); *Larsen v. First Bank*, 245 Neb. 950, 515 N.W.2d 804 (1994).

## ANALYSIS

### PIERCING THE CORPORATE VEIL

For his first assignment of error, Wolf asserts that the district court erred in failing to disregard the corporate entity of Flat Top, to hold it to be the mere alter ego of its only shareholder, and to hold its shareholder personally liable for Flat Top's obligations.

A corporation is a legal entity separate and apart from its officers and shareholders. *Global Credit Servs.*, *supra*. Generally, shareholders are not liable for corporate debts or liabilities. *ServiceMaster Indus.*, *supra*; *Slusarski v. American Confinement Sys.*, 218 Neb. 576, 357 N.W.2d 450 (1984); *United States Nat. Bank of Omaha v. Rupe*, 207 Neb. 131, 296 N.W.2d 474 (1980). In fact, "one of the main reasons for the popularity of corporations is that the stockholders are not personally liable for the debts of the corporation. The corporation, and it alone, is liable. A stockholder stands to lose what he has dedicated to the corporate enterprise and nothing more." 1 William M. Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 14 at 464 (rev. perm. ed. 1990).

A court will disregard a corporation's identity only where the corporation has been used to commit fraud, violate a legal duty, or perpetrate a dishonest or unjust act in contravention of the rights of another. *Global Credit Servs. v. AMISUB*, 244 Neb. 681, 508 N.W.2d 836 (1993). A corporation's identity as a separate legal entity will be preserved, as a general rule, until sufficient reason to the contrary appears. *Southern Lumber & Coal v. M. P. Olson Real Est.*, 229 Neb. 249, 426 N.W.2d 504 (1988); *J. L. Brock Bldrs., Inc. v. Dahlbeck*, 223 Neb. 493, 391 N.W.2d 110 (1986).

Here, Wolf entered into a contract with Flat Top and invested $40,000 of his own funds. Nothing in the record indicates that Wolf inquired into Flat Top's financial health before executing the dairy cattle lease agreement. Further, nothing in the record indicates that Walt volunteered any information regarding Flat Top's assets and liabilities. Wolf asks the court to use its equity powers to pierce Flat Top's corporate veil and allow him to hold Flat Top's principal shareholder accountable for his loss.

"A plaintiff seeking to pierce the corporate veil must allege and prove that the corporation was under the actual control of the shareholder and that the shareholder exercised such control to commit a fraud or other wrong in contravention of the plaintiff's rights." *Global Credit Servs.*, 244 Neb. at 686, 508 N.W.2d at 842. A plaintiff seeking to impose liability for a corporate debt on a shareholder has the burden to show by a preponderance of the evidence that the corporate identity must be disregarded to prevent fraud or injustice to the plaintiff. *Southern Lumber & Coal, supra*; *J. L. Brock Bldrs., Inc., supra*.

Some of the relevant factors in determining whether to disregard the corporate entity on the basis of fraud are:

"(1) Grossly inadequate capitalization; (2) Insolvency of the debtor corporation at the time the debt is incurred; (3) Diversion by the shareholder or shareholders of corporate funds or assets to their own or other improper uses; and (4) The fact that the corporation is a mere facade for the personal dealings of the shareholder and that the operations of the corporation are carried on by the shareholder in disregard of the corporate entity."

*J. L. Brock Bldrs., Inc.*, 223 Neb. at 498, 391 N.W.2d at 115 (quoting *United States Nat. Bank of Omaha, supra*).

Inadequate capitalization means capitalization very small in relation to the nature of the business of the corporation and the risks entailed. The adequacy of capitalization is measured at the time of incorporation. *Global Credit Servs., supra*; *Southern Lumber & Coal, supra*. Wolf adduced evidence regarding the capitalization of Flat Top by calling Walt; the dairy's accountant; and the attorney who incorporated the dairy, Randall Weller.

Walt testified that the total value of the assets contributed to Flat Top was about $1.3 million. Most of the assets contributed consisted of the assets of S & W Dairy, formerly owned by Walt and his wife. Walt further testified that the value of the mortgages against the assets totaled between $950,000 and $1 million. According to Walt, Flat Top's net worth at the time of its incorporation was approximately $300,000. There is no evidence in the record indicating whether this net worth was adequate given the nature of the cattle leasing business and the risks entailed.

Wolf questioned Vaughn Nelson, Flat Top's accountant, regarding Flat Top's and S & W's annual corporate reports, which were required to be filed with the State of Kansas. S & W reported a negative net worth of $74,457.68 as of the end of the calendar year 1988. The Walts alleged that they transferred S & W's assets to Flat Top in early 1989. Flat Top failed to file an annual report for calendar year 1989 as required, and the secretary of state of Kansas ordered the corporation forfeited. As of the time of trial, Flat Top had not been reinstated.

During cross–examination, Nelson testified that the annual corporate reports do not accurately reflect corporate capitalization. According to Nelson, annual corporate reports reflect the tax basis of corporate assets, and the tax basis of an asset is not equal to its fair market value.

Nelson also testified that he prepared a corporate tax return for Flat Top for the corporate tax year 1989. That tax return indicated that the corporation had operating losses of $188,955.21. During cross–examination, Nelson testified that the tax return only reflected income and expenses, rather than Flat Top's assets and liabilities.

Bonnie Walt, Flat Top's corporate secretary–treasurer and Delbert Walt's wife, was called as a defense witness. Bonnie Walt testified that in forming the new corporation, the assets of S & W were merged into Flat Top. S & W's assets included 680 dairy cows. S & W did not own the dairy cows; rather, the cows were leased from investors. Additionally, Delbert and Bonnie Walt allegedly contributed another 200 heifers, 240 acres of land, a house, a barn, a grain storage facility, and grain and growing crops. Other than the Walts' testimony, we have no

other evidence before us to sufficiently indicate the value of Flat Top's corporate assets and liabilities.

The second factor in the test used to determine whether a corporation's identity should be disregarded is whether the corporation was insolvent at the time the debt was incurred. The Nebraska Business Corporation Act provides that a corporation is insolvent if it is unable to pay its debts as they become due in the usual course of its business, or if it has an excess of liabilities of the corporation over its assets at a fair valuation. Neb. Rev. Stat. § 21–2002(15) (Reissue 1991). See, also, *J. L. Brock Bldrs., Inc. v. Dahlbeck*, 223 Neb. 493, 391 N.W.2d 110 (1986). Whether a corporation is insolvent is usually a question of fact. *Id*. Here, the debt was incurred in August 1989. We know that Flat Top made the lease payments as they became due for over a year before they defaulted. We have no other evidence before us to sufficiently indicate whether or not Flat Top was unable to pay any other debts as they became due.

We turn now to the third factor. When a principal shareholder appropriates and uses corporate funds and property for his personal purposes and thereby defrauds and causes damages to creditors, the shareholder can be held individually liable for corporate debt. *Scribner Grain & Lumber Co. v. Wortman*, 204 Neb. 92, 281 N.W.2d 394 (1979). In this case, there is some evidence that funds intended to be used for herd replacement were diverted by Walt for other uses. Walt used those funds for the dairy's taxes, phone bills, and loan repayment. There is no evidence of personal use or waste of Flat Top's funds by Walt.

Finally, if the corporation is a facade for the personal dealings of the shareholder and the operations of the corporation are carried on by the shareholder in disregard . i the corporate entity, the shareholder may be individually liable for corporate debt. *J. L. Brock Bldrs., Inc., supra*. In this case, the Walts were unable to produce any corporate records. Bonnie Walt, the corporation's secretary–treasurer, offered conflicting testimony regarding attendance at meetings of Flat Top's board of directors. Annual shareholder meetings were not conducted.

Although Flat Top failed to maintain corporate formalities, a court of equity is required to examine the whole transaction. We find that there is not sufficient evidence to determine that the

corporation was used to commit fraud, violate a legal duty, or perpetrate a dishonest or unjust act in contravention of Wolf's rights. See *Global Credit Servs. v. AMISUB*, 244 Neb. 681, 508 N.W.2d 836 (1993). Accordingly, we refuse to set aside Flat Top's corporate identity and hold Walt personally liable for the corporation's debts.

## DIRECTED VERDICTS

Wolf argues the district court erred by failing to direct a verdict in his favor on his causes of action and by granting Walt's motions for directed verdict on the causes of action for bailment, conversion, and constructive fraud. In granting Walt's motions for directed verdicts on the causes of action for bailment, conversion, and constructive fraud, the trial court declared that none of Wolf's tort theories were viable and that the matter was a contract case. Giving Wolf the benefit of every inference, we hold that the district court correctly directed a verdict as a matter of law on the issues of bailment, conversion, and constructive fraud.

First, if there was a bailment, the bailment was with Flat Top rather than with Walt. Flat Top is not a party to this action, and for the reasons stated above we refuse to disregard the corporation's identity and hold Walt individually liable.

Second, Wolf's action for conversion necessarily fails. Wolf alleged that the defendants, without notice or authority from him, converted, sold, delivered, or disposed of his 40 dairy cows. However, by the very terms of the dairy lease agreement, Wolf gave possession of the cattle to Flat Top for a 5-year term. Wolf further authorized Flat Top to cull calves and cows as necessary.

" 'Conversion is any unauthorized or wrongful act of dominion exerted over another's personal property which deprives the owner of his property permanently or for an indefinite period of time.' " *Cattle Nat. Bank v. York State Bank*, 229 Neb. 720, 723, 428 N.W.2d 624, 627 (1988). In order to establish conversion, a plaintiff must allege and prove facts showing a right to immediate possession of the property at the time of the conversion. *Id.* Wolf did not have an immediate right to possession of 40 specific cows. Wolf had only the right to

enforce one of the three options provided in the lease agreement at the expiration of its 5-year term. That agreement contemplated that Flat Top could (1) purchase the herd at 50 percent of its original cost, (2) return the herd subject to Wolf's acceptance, or (3) continue the lease for an additional 5-year period. As a matter of law, Wolf failed to establish that he had the right to the immediate possession of the cattle, and his cause of action for conversion necessarily fails.

Wolf's cause of action for constructive fraud also fails. Constructive fraud involves a breach of fiduciary duty. *Vogt v. Town & Country Realty of Lincoln, Inc.*, 194 Neb. 308, 231 N.W.2d 496 (1975). Wolf neither alleged nor proved that Flat Top had any fiduciary duty toward him. A fiduciary duty arises out of a confidential relationship which exists when one party gains the confidence of the other and purports to act or advise with the other's interest in mind. *Bloomfield v. Nebraska State Bank*, 237 Neb. 89, 465 N.W.2d 144 (1991). Further, a stockholder can only be individually liable for a constructive fraud committed by the corporation where he had knowledge of and instigated the fraud. *Vogt, supra.* Wolf failed to prove that Walt had any fiduciary duty toward him and failed to prove that Walt had knowledge of and instigated the purported fraud.

### REMAINING ASSIGNMENTS OF ERROR

Wolf argues that the district court erred in receiving an exhibit without proper identification or foundation and that the exhibit constituted hearsay. Having affirmed the district court's refusal to pierce Flat Top's corporate veil, we need not address this assignment of error.

Wolf argues in his brief that the district court erred in refusing to instruct the jury regarding the definition of inadequate capitalization. However, Wolf failed to assign this as error. Errors which are argued but not assigned will not be considered by an appellate court. *Manske v. Manske*, 246 Neb. 314, 518 N.W.2d 144 (1994).

### CONCLUSION

For the foregoing reasons, the judgment of the district court for Cuming County is affirmed.

AFFIRMED.