MIKE HUFFMAN, APPELLEE AND CROSS-APPELLANT, V.
C. WAYNE POORE, APPELLANT AND CROSS-APPELLEE,
EDNA POORE, APPELLEE AND CROSS-APPELLEE,
AND DANIEL L. OTTO, APPELLEE.

569 N.W.2d 549

Filed October 7, 1997.    No. A-96-287.

44

James J. Paloucek and Royce E. Norman, of Norman & Paloucek Law Offices, for appellant.

Waldine H. Olson and Christopher D. Curzon, of Schmid, Mooney & Frederick, P.C., and Ronald D. Mousel, of Mousel, Garner & Rasmussen, for appellee Huffman.

SIEVERS, MUES, and INBODY, Judges.

SIEVERS, Judge.

Mike Huffman brought an action against Mid States Dairy Leasing, Inc. (Mid States), and three of its officers, directors, and shareholders, C. Wayne Poore, Edna Poore, and Daniel L. Otto, for (1) fraudulent misrepresentation, (2) fraudulent concealment, (3) negligent misrepresentation, and (4) breach of fiduciary duty in connection with Mid States' management of Huffman's dairy cows. Prior to trial, the case against Mid States was dismissed without prejudice. The Red Willow County District Court found in favor of the remaining defendants on all theories of recovery except fraudulent misrepresentation. On that theory, the court found in favor of Huffman against only Wayne and awarded Huffman $25,400. Wayne now appeals, contending that the court erred in holding him liable without evidence to pierce the corporate veil, in finding that he had made fraudulent misrepresentations to Huffman, and in awarding damages not caused by the alleged fraudulent misrepresentation. Huffman cross-appeals on the ground that the court erred in not holding both Wayne and Edna liable for breach of fiduciary duty.

## I. FACTUAL BACKGROUND

Mid States, which began as a partnership between Otto and Joe Frazier in late 1985 or early 1986, is a business which acts as an agent for owners of dairy cows. Mid States sells dairy cows to buyers, called "investors," and then, on behalf of the investors, leases the cows to dairies in Kansas, Colorado, Nebraska, and North Dakota. As part of the service that it provides to its investors, Mid States also manages the cows, which generally includes making inspections of the dairies and cows and reporting back to the investors.

In early 1989, Wayne and Edna bought Frazier's interest in the partnership, and on December 27, 1989, Mid States filed its articles of incorporation. Mid States has three shareholders:

Otto (a 50-percent interest), Wayne (a 25-percent interest), and Edna (a 25-percent interest). These three, along with Melinda Otto, are officers of the corporation and compose the board of directors.

On October 1, 1991, Huffman purchased 10 Holstein dairy cows from Mid States for $12,000 and agreed to have Mid States manage those cows. The record contains four documents dated October 1, 1991: (1) the bill of sale for the 10 cows, (2) a "Management Agreement" entered into between Huffman and Mid States, (3) a "Dairy Cow Lease," and (4) a "Security Agreement." All four documents were signed by Wayne, acting in his capacity as vice president of Mid States. Under the Management Agreement, Mid States agreed to "arrange for the leasing of the cows owned by Owner with [sic] a suitable dairyman who maintains a suitable dairy operation." The Management Agreement specifically stated that the cows had been leased to B. J. Smarsh & Sons (the Smarsh dairy), a dairy in Goddard, Kansas. In the Management Agreement, Mid States agreed, among other things, to make monthly inspections of the cows, provide a consulting and recordkeeping service, confer with the owner on a regular basis to review the status of the leasing operation and to give advice and make recommendations concerning such operations, and provide detailed quarterly reports. As compensation, Mid States was to receive $15 per cow per month.

The Management Agreement referred to the Dairy Cow Lease between Mid States, acting on behalf of Huffman, and the Smarsh dairy. The lease began on October 1, 1991, and was to continue for 5 years. Under the provisions of the lease, Smarsh agreed to pay $21,000 in equal monthly installments of $350 (60 months). Pursuant to paragraph 5.6, "[a]t the termination of the Lease (60 months)," Mid States was to provide Huffman with 10 "bred springing heifers," which met certain criteria, presumably to replace the 10 cows. A springing heifer is a bred heifer ready to give birth to its first calf, and when it gives birth, it becomes a cow. Edna testified that Mid States sold only cows, as opposed to springing heifers, to its investors.

The Smarsh dairy made 22 monthly payments to Huffman under the lease, satisfying its obligation through July 1993. On

August 28, 1993, Mid States discovered that the Smarsh dairy had only 10 head of what should have been a herd of 291 dairy cows. The Smarsh dairy then ceased making its rental payments and soon thereafter filed for bankruptcy. Huffman never received any additional compensation for his 10 cows placed with the Smarsh dairy.

The Smarsh dairy was a family business owned and operated by Bernard J. Smarsh and his two sons, Bernard B. Smarsh and Thomas G. Smarsh. Wayne first inspected the dairy in May or June 1989 and discovered that the facilities and cows were "good" and that the dairy's production records indicated that its cows individually averaged 50 pounds of milk per day. Wayne, however, did not do a cash-flow analysis of the dairy and did not request any financial statements. Mid States first leased its investors' cows to the Smarsh dairy on August 1, 1989.

As of March 1991, Mid States had placed 184 dairy cows with the Smarsh dairy, including 140 leased cows and 44 owned by Mid States. However, when Wayne Poore and Wayne Ball, an investor, traveled to the Smarsh dairy during that same month, some 6 months before the transaction with Huffman, they discovered that the dairy was 80 head short. Bernard B. Smarsh explained that the deficit was due to having to sell cows to pay the dairy's bills, "close culling," sickness and death resulting from bad feed, and the lack of replacement heifers. Wayne Poore testified that Mid States never identified the investors to whom the 80 cows belonged and therefore did not know what leases were in default.

In order to remedy the shortage of cows, Wayne and Otto, on behalf of Mid States, and the Smarsh dairy entered into an agreement whereby on April 1, 1991, the Smarsh dairy transferred ownership of its entire heifer crop of 99 calves to Mid States. However, none of the 99 were old enough to replace the 80 missing cows. According to Wayne, the Smarsh dairy also agreed to sell some of its own crops to buy replacement cows. At some point, Mid States exchanged 41 of these 99 heifers for 30 Holstein springing heifers. In his subsequent visits to the Smarsh dairy, Wayne discovered that although the head count was still short, the size of the herd was increasing. Ball, who made several additional trips to the dairy with Wayne, testified

that on various occasions they discovered shortages of 10, 20, 32, and 40 cows. Wayne testified that by July 1991 he knew that the Smarsh dairy had not used crop money to buy replacements. Wayne and Edna, through Mid States as their agent, personally leased 30 of their own cows to the Smarsh dairy on June 1, 1991. Although Mid States had purchased 291 cows for the Smarsh dairy, 275 of which its investors had purchased and leased back to the dairy, by the end of August 1993 only 10 cows remained at the Smarsh dairy.

The testimony from Bernard B. Smarsh reveals that the Smarsh dairy had financial problems dating back to at least 1986. After beginning its arrangement with Mid States, the Smarsh dairy had a culling rate of approximately 35 percent of the herd and was unable to replace the cows with springing heifers. The dairy continually had problems paying its bills and had to make rental payments on cows that did not exist. Smarsh also testified that the price of milk hit an all-time low in the spring of 1991.

Willis Armbrust, a judge of dairy cattle, testified that in his opinion, as of April 1, 1991, the Smarsh dairy was not a suitable dairy. Armbrust explained that the dairy had an excessive culling rate (normal rates run between 15 and 20 percent) and an insufficient inventory of heifer calves. Armbrust further testified that the dairy was unsuitable because of its shortages of cattle, its sale of replacement heifers, and its financial problems. Armbrust's testimony was based on his review of the testimony of Wayne, Otto, and one of the Smarshes.

The record further reveals that Huffman had previously used Mid States, working with Otto, to lease cows to another dairy without any problems. At trial, Otto maintained that Mid States did not solicit Huffman to invest. The only other testimony on such subject was from Huffman himself, a friend and former employee of Wayne's. According to Huffman,

> I would visit with Wayne Poore on occasion and at some point he mentioned that he had some dairy cattle that were close to being ready to be placed, and I had saved up some money over a period of time and when I had approximately the $12,000 for ten head, then I went out and talked to him about it.

Huffman testified that he made his investment based on Wayne's experience, the fact that Wayne himself was investing, and their friendship. However, Huffman admitted that Wayne never discussed the Smarsh dairy operation with him. Huffman also admitted that when he made the decision to buy the cows, he did not really know for sure that they were going to end up at the Smarsh dairy. According to Huffman, he learned either at. the time he delivered the check (a time which is not in evidence) or shortly thereafter that the cows were going to the Smarsh dairy. Huffman also testified that he could not remember whether Edna said anything to him.

The trial court found for the defendants on all causes of action except fraudulent misrepresentation. On that cause of action, the court found in favor of Huffman against only Wayne. In its findings of fact, the court stated: "By March 1 of 1991, Mid-States as well as each of the Defendants individually had knowledge that the Smarsh Dairy was a financially troubled operation and was not a suitable dairy." With regard to Huffman's fraudulent misrepresentation claim, the court found:

> In this case, the Plaintiff has proven by the greater weight of the evidence, each and all of the elements set forth above, only as to the Defendant, C. Wayne Poore. The Plaintiff was induced by Mr. Poore to purchase ten cows upon a representation that the cows would be placed with a "suitable dairyman." In March of 1991, and certainly before October 1, 1991, Mr. Poore clearly knew that this representation was false. The expression was not merely an opinion. It was a statement of fact that the Plaintiff reasonably relied upon prior to entering into the agreement with the Smarsh Dairy.
>
> I therefore find in favor of the Plaintiff and against the Defendant, C. Wayne Poore, on this cause of action. Since the Plaintiff's own testimony establishes that he did not have any contact with the remaining Defendants concerning his investment with the Smarsh Dairy, I find in favor of Mrs. Poore and Dr. Otto, and against the Plaintiff on this cause of action.

The court then, noting that Huffman had elected to affirm the agreement and sue for damages, awarded Huffman the following: (1) the loss of 39 monthly lease payments at a net rate of

$20 per head per month for a total of $7,600; (2) the value of 10 bred replacement heifers as of August 1993, which was $11,000 ($1,100 per heifer); (3) the agreed salvage value of the dairy cows at $350 per head for a total of $3,500; and (4) reimbursement for management fees paid to Mid States for a period of 22 months at the rate of $15 per head per month for a total of $3,300. Wayne filed a motion for a new trial, which the trial court overruled. Wayne now appeals.

## II. ASSIGNMENTS OF ERROR

Wayne contends that the trial court erred in (1) holding him personally liable for the damages claimed by Huffman without piercing the corporate veil, (2) finding in favor of Huffman on the fraudulent misrepresentation claim, (3) awarding damages not caused by the alleged fraudulent misrepresentation, (4) awarding elements of damage which have no factual basis in the record, and (5) overruling Wayne's motion for a new trial.

Huffman cross-appeals, arguing that the trial court erred in finding that Edna and Wayne were not liable for breach of fiduciary duty.

## III. STANDARD OF REVIEW

■■■ In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict and will not be set aside on appeal unless they are clearly wrong. *Cotton v. Ostroski*, 250 Neb. 911, 554 N.W.2d 130 (1996). In reviewing a judgment awarded in a bench trial, an appellate court does not reweigh the evidence, but considers the judgment in a light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. *Id.*

■■■ When reviewing a question of law, an appellate court reaches a conclusion independent of the lower court's ruling. *Blanchard v. City of Ralston*, 251 Neb. 706, 559 N.W.2d 735 (1997).

## IV. ANALYSIS

### 1. Personal Liability of Officers and Directors for Fraudulent Misrepresentation

■■■ Generally, a corporation's officers and directors are not liable to the corporation's creditors or third persons for corpo-

rate acts or debts, simply by reason of an official relation with the corporation. *Walker v. Walker Enter.*, 248 Neb. 120, 532 N.W.2d 324 (1995); *Hecker v. Ravenna Bank*, 237 Neb. 810, 468 N.W.2d 88 (1991). Similarly, a corporation's officers and directors are in the same position as agents of private individuals and are not personally liable on a corporation's contract unless the corporate officers and directors purport to bind themselves, or have bound themselves, to performance of the contract. *Walker v. Walker Enter., supra*; *Hecker v. Ravenna Bank, supra.*

■ However, it has long been held in Nebraska that where fraud is committed by a corporation, it is time to disregard the corporate fiction and hold the persons responsible therefor liable in their individual capacities. *ServiceMaster Indus. v. J.R.L. Enterprises*, 223 Neb. 39, 388 N.W.2d 83 (1986) (action against principal stockholder and officer for fraudulent misrepresentation); *Hahn & Hupf Constr. v. Highland Heights Nsg. Home*, 222 Neb. 189, 382 N.W.2d 607 (1986) (actions against directors for false and fraudulent representations), *overruled on other grounds, Nielsen v. Adams*, 223 Neb. 262, 388 N.W.2d 840 (1986); *Fowler v. Elm Creek State Bank*, 198 Neb. 631, 254 N.W.2d 415 (1977) (action against directors and stockholders for fraud and negligent mismanagement and dissipation of corporate assets); *Allied Building Credits, Inc. v. Damicus*, 167 Neb. 390, 93 N.W.2d 210 (1958) (action for fraudulent misrepresentation against officer); *Ashby v. Peters*, 128 Neb. 338, 258 N.W. 639 (1935) (action against directors and shareholders for conspiracy to defraud); *Paul v. Cameron*, 127 Neb. 510, 256 N.W. 11 (1934) (directors liable for fraudulent misrepresentation); *Ashby v. Peters*, 124 Neb. 131, 245 N.W. 408 (1932) ("[t]he officers of a corporation are responsible for the acts of the corporation, and in a suit for fraud, if fraud is proved, the law will look through the corporation to the officers who acted in the matter, and the officers who acted in the premises are proper parties defendant" (syllabus of the court)). A director who misrepresents a material fact to another to induce the latter to enter into a financial relation with a corporation, to that person's detriment, may be liable to such other person for fraud and misrepresentation. *Hahn & Hupf Constr. v. Highland Heights Nsg. Home, supra.*

Wayne contends that the corporate veil must be pierced before he can be held personally liable for fraud. Wayne bases his argument on the following language from *Wolf v. Walt*, 247 Neb. 858, 866, 530 N.W.2d 890, 896 (1995):

> Some of the relevant factors in determining whether to disregard the corporate entity on the basis of fraud are: " '(1) Grossly inadequate capitalization; (2) Insolvency of the debtor corporation at the time the debt is incurred; (3) Diversion by the shareholder or shareholders of corporate funds or assets to their own or other improper uses; and (4) The fact that the corporation is a mere facade for the personal dealings of the shareholder and that the operations of the corporation are carried on by the shareholder in disregard of the corporate entity.' "

See, also, *Carpenter Paper Co. v. Lakin Meat Processors*, 231 Neb. 93, 435 N.W.2d 179 (1989); *Southern Lumber & Coal v. M. P. Olson Real Est.*, 229 Neb. 249, 426 N.W.2d 504 (1988); *J. L. Brock Bldrs., Inc. v. Dahlbeck*, 223 Neb. 493, 391 N.W.2d 110 (1986). Wayne argues that because there was no evidence introduced to prove any of these four factors, the court could not pierce the corporate veil and hold him individually liable for fraudulent misrepresentation.

■ Wayne overlooks a crucial distinction between actions against shareholders who control the corporation to such an extent that it becomes their alter ego and actions against officers or directors for their individual torts. Piercing the corporate veil is a tool that courts use to prevent shareholders, who are not normally liable for corporate debts or liabilities, from hiding behind the corporate shield when the corporation is under their direct control. In such cases, a court will disregard a corporation's identity and hold the shareholder liable for the corporation's debt only where the corporation has been used to commit fraud, violate a legal duty, or perpetrate a dishonest or unjust act in contravention of the rights of another. *Wolf v. Walt, supra* (action against only shareholder); *Carpenter Paper Co. v. Lakin Meat Processors, supra* (action against sometimes sole and sometimes majority shareholder); *Southern Lumber & Coal v. M. P. Olson Real Est., supra* (action against sole shareholder and employee); *J. L. Brock Bldrs., Inc. v. Dahlbeck, supra*. See,

also, *Slusarski v. American Confinement Sys.*, 218 Neb. 576, 357 N.W.2d 450 (1984) (action against three shareholders); *United States Nat. Bank of Omaha v. Rupe*, 207 Neb. 131, 296 N.W.2d 474 (1980) (action against sole shareholder). If the corporate veil is pierced, individual liability will be imposed for the corporate debt. See, e.g., *Wolf v. Walt, supra*; *J. L. Brock Bldrs., Inc. v. Dahlbeck, supra.*

■ However, where a tort action is brought against an officer or director, there is no need to pierce the corporate veil and liability will be imposed if the elements of the tort are satisfied. See, *ServiceMaster Indus. v. J.R.L. Enterprises, supra*; *Hahn & Hupf Constr. v. Highland Heights Nsg. Home, supra.* Even in *Wolf v. Walt, supra*, after the court refused to pierce the corporate veil, it still addressed whether there was evidence to overcome the defendant's motion for directed verdict on the plaintiff's causes of action for bailment, conversion, and constructive fraud. *Wolf v. Walt* thus provides further support for the proposition that it is not necessary to pierce the corporate veil in tort actions for fraud against officers and directors of a corporation.

■ Nebraska's position on the personal liability of officers and directors and when it is necessary to pierce the corporate veil for their torts comports with that of a leading commentator on corporations: "Ordinarily, corporate directors are personally liable, independently of statute, for fraud or for false and fraudulent representations which they or their agents made within the scope of their employment, or for those which were approved or ratified." 3A William M. Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 1192 at 449 (rev. perm. ed. 1994). Fletcher continues:

> An officer of a corporation who takes part in the commission of a tort by the corporation is personally liable for resulting injuries; but an officer who takes no part in the commission of the tort is not personally liable to third persons for the torts of other agents, officers or employees of the corporation. Officers and directors may be held individually liable for personal participation in tortious acts even though they derived no personal benefit, but acted on behalf, and in the name of, the corporation, and the corporation alone was enriched by the acts.

It is not necessary that the "corporate veil" be pierced in order to impose personal liability as long as it is shown that the corporate officer knowingly participated in the wrongdoing. However, it is necessary to pierce the corporate veil in order to impose personal liability upon a non-participating corporate officer.

*Id.*, § 1137 at 300-01.

Similarly, the text writers observe:

The cases are agreed that a director or officer of a corporation is not liable, merely because of his official character, for the fraud or false representations of the other officers or agents of the corporation or for fraud attributable to the corporation itself, if such director or officer is not personally connected with the wrong and does not participate in it. On the other hand, it is clearly established that a director or officer of a corporation is individually liable for fraudulent acts or false representations of his own or in which he participates, even though his action in such respect may be in furtherance of the corporate business. . . . The rationale for holding an officer or director individually responsible is that fraud and deceit is a tort which causes a direct and unique injury to a third party, for example, a creditor, thereby permitting the injured third party to proceed directly and solely on his own behalf against the offending officer or director.

. . . .

Acts of corporate officers may constitute a fraud upon the creditors of the corporation by which their rights are prejudiced and may render them liable to the creditors for the damages suffered thereby. Directors are personally liable for fraudulent representations whereby a person is induced, to his injury, to contract with the corporation, the liability being based upon the tort, not upon the contract.

18B Am Jur. 2d *Corporations* § 1882 at 730-32 (1985).

Given that the basis of the trial court's finding against Wayne was fraudulent misrepresentation, the corporate veil did not have to be pierced in order to hold Wayne, as an officer and director of Mid States, liable for fraudulent misrepresentation.

## 2. FRAUDULENT MISREPRESENTATION

In order to sustain a cause of action for fraudulent misrepresentation, a plaintiff must show (1) that a representation was made, (2) that the representation was false, (3) that when made the representation was known to be false or made recklessly without knowledge of its truth and as a positive assertion, (4) that it was made with the intention that the plaintiff should rely upon it, (5) that the plaintiff reasonably did so rely, and (6) that he or she suffered damage as a result. *Alliance Nat. Bank v. State Surety Co.*, 223 Neb. 403, 390 N.W.2d 487 (1986); *Servicemaster Indus. v. J.R.L. Enterprises*, 223 Neb. 39, 388 N.W.2d 83 (1986); *Hahn & Hupf Constr. v. Highland Heights Nsg. Home*, 222 Neb. 189, 382 N.W.2d 607 (1986). A plaintiff does not, however, have to prove intent to deceive to sustain a cause of action for fraudulent misrepresentation. *Alliance Nat. Bank v. State Surety Co., supra*; *Nielsen v. Adams*, 223 Neb. 262, 388 N.W.2d 840 (1986). Poore contends that Huffman failed to produce sufficient evidence on the first and third elements.

Courts of law require proof of fraud by a preponderance of the evidence, while courts of equity require clear and convincing evidence. *Bock v. Bank of Bellevue*, 230 Neb. 908, 434 N.W.2d 310 (1989); *Tobin v. Flynn & Larsen Implement Co.*, 220 Neb. 259, 369 N.W.2d 96 (1985). Since this is an action at law, Huffman must prove the fraudulent misrepresentation by a preponderance of the evidence. See *Alliance Nat. Bank v. State Surety Co., supra.*

In a fraud case, direct evidence is not essential, but proof of fraud drawn from circumstantial evidence must not be guesswork or conjecture; such proof must be rational and logical deductions from the facts and circumstances from which they are inferred. *Schuelke v. Wilson*, 250 Neb. 334, 549 N.W.2d 176 (1996).

Wayne first contends that the court erred in finding that he had made a representation to Huffman. It is undisputed that Wayne made no oral representations to Huffman. The trial court predicated liability upon the representation made in the Management Agreement that Mid States would place Huffman's cows "with a suitable dairyman who maintains a suitable dairy operation."

To constitute fraud, a misrepresentation must be an assertion of fact, not merely an expression of opinion. *Ed Miller & Sons, Inc. v. Earl*, 243 Neb. 708, 502 N.W.2d 444 (1993). The fraud involved in the misrepresentation must relate to a present or preexisting fact and generally may not be predicated on an inference concerning any event in the future or acts to be done in the future unless such representations as to future acts are falsely and fraudulently made with an intent to deceive. *Havelock Bank v. Woods*, 219 Neb. 57, 361 N.W.2d 197 (1985), *overruled on other grounds, Nielsen v. Adams, supra.*

The Management Agreement stated that (1) Huffman's cows would be placed with a "suitable dairyman" who ran a suitable dairy operation and (2) the cows had been leased to the Smarsh dairy. When these statements are read together, the agreement therefore represented that Huffman's cows had been placed with a suitable dairy, the Smarsh dairy. This was a statement of present fact and not a mere expression of opinion or inference concerning any event in the future. We thus conclude that these statements constituted a representation.

Wayne argues that the statements in the Management Agreement were a representation made by Mid States rather than by him, and therefore he cannot be held liable. It is true that Wayne signed the agreement in his official capacity as vice president of Mid States. However, the evidence reveals that Wayne was the only representative of Mid States with whom Huffman had contact concerning the investment in dairy cattle to be placed at the Smarsh dairy. As stated above, officers and directors of a corporation may be held individually liable for personal participation in tortious acts even though they derived no personal benefit, but acted on behalf of, and in the name of, the corporation and the corporation alone was enriched by the acts. 3A William M. Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 1137 (rev. perm. ed. 1994). See, also, 18B Am. Jur. 2d *Corporations* § 1882 (1985). Moreover, as also stated above, a director who misrepresents a material fact to another to induce the latter to enter into a financial relation with a corporation, to that person's detriment, may be liable to such other person for fraud and misrepresentation. *Hahn & Hupf Constr. v. Highland Heights Nsg. Home, supra.* Thus, Wayne

can be held individually liable for fraudulent misrepresentation if Huffman satisfies his burden. However, the other officers and directors, specifically Edna and Otto, cannot be held personally liable for Wayne's actions in the absence of evidence that they also participated in some manner. An officer who takes no part in the commission of the tort is not personally liable to third persons for the torts of other agents, officers, or employees of the corporation. 3A Fletcher, *supra.*

Wayne does not argue that the Smarsh dairy was a suitable dairy. There is ample evidence in the record to support the finding that the Smarsh dairy was not a suitable dairy. The record reveals that prior to October 1, 1991, the Smarsh dairy was 80 short in a herd of 184, had a culling rate of 35 percent of the herd or better, did not have sufficient funds with which to pay its bills and debts, did not have a replacement heifer herd, and had lost a significant portion of the herd to bad feed. Armbrust, a judge of dairy cattle, testified to what seems fairly obvious: that as of April 1, 1991, the Smarsh dairy was not a suitable dairy.

Wayne claims that there was insufficient evidence to conclude that he knew that the dairy was unsuitable. We disagree. Wayne knew in March 1991 that 80 of the 184 cows, or 43 percent of the dairy herd, were missing. That fact by itself ought to have told Wayne, whose business was the placement of his "investors'" cattle, that the Smarsh dairy was unsuitable. What investors would want their dairy cattle going to a dairy which "loses" nearly half its herd? Thereafter, Wayne entered into an agreement with the dairy in which it transferred to Mid States its entire herd of 99 heifers, none of which were ready to produce milk. Moreover, Wayne should have known that by transferring its entire herd of replacement heifers to Mid States, the dairy would be unable to replace any culled cows. Wayne also knew by July 1991 that the Smarsh dairy had not fulfilled its promise to sell its crops to add replacement cows. While Wayne may have been trying to give the Smarsh dairy the benefit of the doubt and therefore may not have "known" that his representation was false, there is abundant evidence to show that the representation was, at the very least, made recklessly and as a positive assertion.

Reliance is clearly proven, and Wayne does not dispute that the representation was made with the intention that Huffman should rely upon it and that Huffman did rely on it. However, Wayne does contend that his statement was not the proximate cause of Huffman's damages. False representations must be the proximate cause of the damage before a party may recover. *Alliance Nat. Bank v. State Surety Co.*, 223 Neb. 403, 390 N.W.2d 487 (1986). But for the representation made by Wayne in the Management Agreement that the Smarsh dairy was a suitable dairy operation, Huffman would not have agreed to lease his cattle to the Smarsh dairy. See, e.g., *id.* Having reviewed the evidence in the light most favorable to Huffman, the successful party, we cannot say that the trial court's finding that Wayne made a fraudulent misrepresentation to Huffman, which proximately caused Huffman's damages, was clearly wrong.

### 3. DAMAGES

We now turn to whether the trial court used the proper measure of damages. One who has been induced to enter into an agreement by virtue of a material misrepresentation, that is to say, by virtue of fraud, may either affirm the agreement and sue for damages or disaffirm the agreement and sue to be reinstated to his or her position as it existed before entry into the contract. *Tobin v. Flynn & Larsen Implement Co.*, 220 Neb. 259, 369 N.W.2d 96 (1985). This is so because one remedy, damages, depends upon the existence of a contract, and the other, rescission, depends upon the concept that because of the fraud no contract came into existence. *Id.* Huffman elected to affirm the agreement, and thus he is entitled to recover such damages as will compensate him for the loss or injury actually caused by the fraud and place him in the same position as would have existed had there been no fraud. See *Alliance Nat. Bank v. State Surety Co., supra.*

### (a) Loss of Rent

The trial court first awarded Huffman "[t]he loss of 39 monthly lease payments at a net rate of $20 per head per month for a total of $7,600." (However, $200 per month for Huffman's 10 head multiplied by 39 months equals $7,800. But as demon-

strated below, the court meant 38 monthly payments.) Under the terms of the Dairy Cow Lease and the Management Agreement, the Smarsh dairy was to make 60 monthly payments of $350 (10 cows at $35 per cow per month) to Huffman, $150 (10 cows at $15 per month per cow) of which was to be paid to Mid States as its management fee. Thus, Huffman was to net $200 a month. The Smarsh dairy failed to make 38 payments. At a net of $200 per month, Huffman should have received a total of $7,600. Thus, the trial court properly awarded $7,600 in damages for loss of rent.

### (b) Value of 10 Replacement Heifers

The trial court additionally awarded Huffman "[t]he value of ten bred replacement heifers as of August 1993, the fair market value of which would be $1,100 per heifer for a total amount of $11,000." As stated above, Huffman elected to affirm the lease, and therefore he is entitled to be put in the same position he would have been had there been no fraud. See *Alliance Nat. Bank v. State Surety Co., supra.* Under paragraph 5.6 of the Dairy Cow Lease, at the end of the 60-month lease, Mid States was to provide Huffman with "a number of bred springing heifers equal to the number of Cows" subject to the lease, which heifers were to meet certain quality standards. Armbrust testified that the value of bred springing heifers in August 1993 was in the $1,100 range. Armbrust further testified that he had personally sold some heifers in 1995 in the $1,000 to $1,250 range.

Wayne contends that since Huffman would not be entitled to receive 10 bred replacement heifers until the termination of the 60-month lease, the correct measure of damages is the value of the 10 heifers on October 1, 1996. Wayne further contends that because Huffman did not present any evidence as to the value of such heifers on October 1, 1996, the trial court's award for replacement costs was pure speculation. The measure of damages for breach of contract, where the contract is to tender specific property, is the value of the property at the time of the breach. *Consumers Cooperative Assn. v. Sherman,* 147 Neb. 901, 25 N.W.2d 548 (1947). At the time of the breach in August 1993, the value of the 10 replacement heifers was approximately $1,100 each. The trial court did not err in this award of damages.

### (c) Salvage Value of Huffman's 10 Dairy Cows

The trial court also awarded Huffman "[t]he agreed salvage value of the dairy cows at $350 per head for a total amount of $3,500." While the Management Agreement is silent on the issue of salvage value, paragraph 5.4 of the Dairy Cow Lease provides, in relevant part: "Upon the replacement of the culled Cow with a satisfactory replacement Cow by Lessee [Smarsh dairy], Lessor [Huffman] shall endorse any bank draft or check to the order of Lessee [Smarsh dairy] and shall deliver any other proceeds to Lessee [Smarsh dairy]." Thus, it appears that, by contrast, Smarsh was to get the salvage value. However, Wayne admitted at trial that up to a point in time Mid States told its investors that they would all receive $350 salvage value for culled cows and that after that point they would receive the "average salvage value." Wayne also testified that he presumed that Huffman was told that he would receive a salvage value of $350. While the testimony appears to be in conflict with the terms of the lease, Wayne does not complain about this portion of the damage award on appeal. Thus, we will not disturb it.

### (d) Reimbursement of Mid States' Management Fees

On this issue, the trial court found as follows:

4) Reimbursement for management fees paid to Mid-States for a period of 22 months at the rate of $15 per head per month for a total of $3,300. I find that these management fees were essentially worthless, as no relevant financial reports or information [was] furnished to the Plaintiff during the term of the lease. The Defendants failed to inspect the books and records of the Smarsh Dairy, and their inspections showed a continuing pattern of shortages of cows at the Smarsh Dairy in that 22 month period of time.

Had there been no fraud, at the end of the lease Huffman would have paid 60 months' worth of management fees to Mid States. While Huffman might be able to recover the management fees he paid in a breach of contract action, a matter which we do not decide, he cannot recover the 22 months' worth of management fees that he did pay to Mid States, because he would not have been entitled to those at the termination of the

Dairy Cow Lease and he did in fact receive 22 months of lease payments. Thus, we conclude that the trial court erred in assessing $3,300 in management fees against Wayne.

### 4. MOTION FOR NEW TRIAL

Wayne also assigns, but fails to discuss, the court's denial of his motion for new trial. Errors assigned but not argued will not be addressed. *Van Ackeren v. Nebraska Bd. of Parole*, 251 Neb. 477, 558 N.W.2d 48 (1997).

### 5. CONSTRUCTIVE FRAUD/BREACH OF FIDUCIARY DUTY

On cross-appeal, Huffman contends that the trial court erred in finding that Wayne and Edna were not liable for constructive fraud by the breach of a fiduciary duty. A fiduciary duty arises out of a confidential relation, which exists when one party gains the confidence of another and purports to act or advise with the other's interest in mind. *Wolf v. Walt*, 247 Neb. 858, 530 N.W.2d 890 (1995). A stockholder can be individually liable for a constructive fraud committed by the corporation only where he had knowledge of and instigated the fraud. *Id.* In the instant case, Huffman failed to prove that Wayne or Edna had any fiduciary duty toward him, and such duty does not automatically arise merely because the parties entered into a contract. There is no evidence in the record that Wayne or Edna gained the confidence of Huffman. Thus, the trial court did not err in its finding that only Wayne was liable.

## V. CONCLUSION

Finding that the trial court erred only in its award of reimbursement of the $3,300 in management fees, we remand with directions to reduce the judgment by that amount. In all other respects, the trial court's judgment is affirmed.

AFFIRMED AS MODIFIED, AND CAUSE
REMANDED WITH DIRECTIONS.